UNITED STATES of America,
Plaintiff,

v.

Leroy RAMSEY, Defendant.

UNITED STATES of America,
Plaintiff,

v.

Raymond HURST, William Reece et al.,
Defendants.

Crim. A. Nos. 6582, 6629.

United States District Court
E. D. Tennessee,
Northeastern Division.

July 8, 1963.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., David Smith, Asst. U. S. Atty., Knoxville, Tenn., for plaintiff.

G. Edward Friar, William A. Reynolds, Knoxville, Tenn., for defendants.

NEESE, District Judge.

The respective captioned defendants were convicted by juries of violating the federal internal revenue liquor laws. Each conviction rests on the entrapping activities of J. S. (Stokes) French, a paid informer of the federal government. French, himself, was not produced by the prosecution as a witness although the defendants, in an informal pretrial conference, called on the prosecution to have French present to testify on the trials, and themselves had caused subpoenas to be issued for this informer. The prosecution relied on the testimony and other evidence adduced by regular agents of the Alcohol and Tobacco Tax Division, Internal Revenue Service, Treasury Department. Each defendant, *inter alia*, contended he had been unlawfully entrapped by French.

The Court took under advisement, at the conclusion of all the proof in each of the cases, motions of the respective defendants for entry of judgments of acquittal. Following the respective jury verdicts, each defendant either filed or lodged with the clerk respective notices of appeal, motions for judgments of acquittal "notwithstanding the verdict", or in the alternative, for new trials, and motions for new trials.

Patently, the Federal Rules of Criminal Procedure have not been followed literally by the defendants in the post-trial pleadings, and the prosecution urges the Court not to consider these post-verdict motions for such reason.

The issue with which the Court is confronted is whether federal trial courts possess the power to supervise federal law enforcement to the extent of requiring fair conduct from federal agents in furnishing evidence of crime, and if so, whether the prosecution will be required to offer as a witness, where the defense interposed in a criminal case is unlawful entrapment, its paid informer on whose entrapping activities convictions rest.

As to the initial part of this proposition, defendants invite the Court's attention to the majority opinion from the Fifth Circuit with reference to " * * * the duty of the courts in federal criminal cases to require fair and lawful conduct from federal agents in the furnishing of evidence of crimes. * * * " Williamson v. United States, C.A. 5th (1962), 311 F.2d 441, 444[2]. Each of the three Circuit Judges considering Williamson

wrote separate opinions, the majority concluding that entrapment is generally unlawful as a matter of law where government agents hire an informer under a contingent fee arrangement and the conviction is sustained by evidence provided by such informer. Ibid.

Williamson, however, is superseded by the more recent opinion of the Supreme Court of the United States in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462. There are also three separate opinions in Lopez: the majority opinion by Mr. Justice Harlan raises and discusses the entrapment issue but questions the submission of this issue by the trial court to the jury in the first place; the dissenting opinion of Mr. Justice Brennan pretermits consideration of the entrapment question; while the Chief Justice, concurring with the majority's result, appears to support Williamson, supra, as to the necessity of the Government's having the informer present to testify and to be cross-examined by defense counsel. Further, both the concurring and dissenting opinions conclude that the majority was wrong in affirming *sub silento* the hallmark 5–4 holding in On Lee v. United States (1952), 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 regarding the duty of courts to require fair play in federal law enforcement. Ibid. Some of the justices seem to be at variance as to whether and when courts even possess the power to so supervise federal law enforcement, viz.:

The majority in Lopez states that "* * * the court's inherent power to refuse to receive material evidence is a power that must be sparingly exercised. * * * (adding:)

"The function of a criminal trial is to seek out and determine the truth or falsity of the charges brought against the defendant. Proper fulfillment of this function requires that, constitutional limitations aside, all relevant, competent evidence be admissible, unless the manner in which it has been obtained—for example, by violating some statute or rule of procedure—compels the formulation of a rule excluding its introduction in a federal court." [citations]. The majority found none such in the case there under consideration, stating: " * * * There has been no invasion of constitutionally protected rights, and no violation of federal law or rules of procedure. * * There has, in short, been no act of any kind which could justify the creation of an exclusionary rule. * * * "

The dissenters, on the other hand, expressed the view that insofar as Olmstead v. United States (1928), 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 " * * * rests on the notion that the federal courts may not exclude evidence, no matter how obtained, unless its admission is specifically made illegal by federal statute or by the Constitution, the decision is manifestly inconsistent with what has come to be regarded as the scope of supervisory power over federal law enforcement. [citations]. We are empowered to fashion rules of evidence for federal criminal trials in conformity with 'the principles of the common law as they may be interpreted * * * in the light of reason and experience.' Rule 26, Federal Rules of Criminal Procedure. [In the instance before the Court] we ought to devise an appropriate prophylactic rule. The Court's suggestion that the supervisory power may never be invoked to create an exclusionary rule of evidence unless there has been a violation of a specific federal law or rule of procedure is * * * a gratuitous attempt to cripple that power. * * * " Ibid.

The Chief Justice joined his dissenting colleagues on this point, stating that " * * * (i)f a party were to show that the interests of justice in a particular case so require, the Court should consider limiting the use of [certain described] evidence * * *. * * * To so condition the use of evidence in the federal courts is clearly within the power of this Court. * * * [citing McNabb v. United States (1943), 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 and others]"

A majority of the Court in a subsequent decision observed that the " * * * 'principles governing the admissibility of

evidence in federal criminal trials have not been restricted * * * to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts * * * this Court has * * * formulated rules of evidence to be applied in federal criminal prosecutions.' McNabb v. United States, 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943); cf. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L. Ed.2d 1332 (1958); Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937). * * * " Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726. After pointing to the fact that the Court had invoked its supervisory power over the administration of criminal justice in the federal courts in Elkins v. United States (1960), 364 U.S. 206, 216, 80 S.Ct. 1437, 4 L.Ed. 2d 1669, Mr. Justice Clark stated for this later majority that " * * * the demands of our federal system compel us to distinguish between evidence held inadmissible because of our supervisory powers over federal courts and that held inadmissible because prohibited by the United States Constitution. * * * " Ibid.

■ Thus, it appears to this Court that a majority of the Supreme Court of the United States has now agreed that the Supreme Court has supervisory powers over the administration of justice in the federal courts. It also appears that there is respectable authority for the proposition that federal trial courts have the duty to require fair and lawful conduct from federal agents in the furnishing of evidence of crime. Williamson v. United States, supra, 311 F.2d at page 444.

Proceeding to the latter part of the question raised, the Court relies on both Williamson, supra, and the concurring opinion of the Chief Justice of the United States in Lopez, supra. In the latter, discussing On Lee, supra, regarding the withholding from the witness stand by the prosecution of a "special employee"

or paid informer, the Chief Justice struck a parallel with the cases at bar.

According to the Chief Justice: " * * * To strengthen its case against On Lee, the government sent a 'special employee,' [to call on On Lee at his place of business in an effort to entrap him. The informer] had known On Lee for 16 years and had formerly been his employee. His [the informer's] criminal character is exposed by the familiarity with which he and On Lee discussed the [illegal] traffic and the agreement of the latter to supply him with [contraband] at his request in the future. * * * At trial, instead of calling [the informer] to testify, the Government put on the * * * agent * * * to testify to the admissions made by On Lee, testimony that led directly to conviction.

" * * * The Court in On Lee itself stated:

" 'We can only speculate on the reasons why [the informer] was not called. It seems a not unlikely assumption that the very defects of character and blemishes of record which made On Lee trust him with confidences would make a jury distrust his testimony. [The informer] was close enough to the underworld to serve as bait, near enough the criminal design so that petitioner [On Lee] would embrace him as a confidante, but too close to it for the Government to vouch for him as a witness. Instead, the Government called [the] agent * * *.'

"However, there were further advantages in not using [the informer]. Had [the informer] been available for cross-examination, counsel for On Lee could have explored the nature of [the informer's] friendship with On Lee, the possibility of other * * * conversations. and appeals to friendship, the possibility of entrapments, police pressure brought to bear to persuade [the informer] to turn informer, and [the informer's] own recollection of the contents of the conversation. His testimony might not only have seriously discredited the prosecution, but might also have raised questions.

of constitutional proportions. *This Court has not yet established the limits within which the police may use an informer to appeal to friendship and comraderie-in-crime to induce admissions from a suspect,* but suffice it to say here, the issue is substantial. * * * (T)he fact remains that without the testimony of [the informer], counsel for On Lee could not develop a record sufficient to raise and present the issue for decision, and the courts could not evaluate the full impact of such practices upon the rights of an accused or upon the administration of criminal justice. (Italics added for emphasis.)

"It is no answer to say that the defense can call an informer such as [this informer] as a hostile witness. The prosecution may have an interest in concealing his identity or whereabouts. [citation]. He may be so undependable and disreputable that no defense counsel would risk putting him on the stand. Moreover, as a defense witness, he would be open to impeachment by the Government, his late employer. The tactical possibilities of this situation would be apparent to a prosecutor bent on obtaining conviction. * * *" If not required to call the informer, "he may place in the case-in-chief evidence of statements supporting conviction which is not open to impeachment. And if not required to call the informer, he may place on the defense the onus of finding and calling a disreputable witness who if called, may be impeached on all collateral issues favoring the defense. The effect on law enforcement practices need hardly be stated: the more disreputable the informer employed by the Government, the less likely the accused will be able to establish any questionable law enforcement methods used to convict him." Lopez v. United States, supra.

■ In these cases all three defendants were entrapped by the paid government informer, French. The Court submitted the entrapment issue to the respective juries on the basis of guidelines laid down by the United States Court of Appeals for the Sixth Circuit, and, evidently, such juries found thereunder French's entrapment of the defendants to have been lawful.

These were not the first and only cases in this court dependent on the entrapping activities of French. At former trials he testified; in these cases, he was in Ohio outside the jurisdiction of this court while these trials were in progress, despite defendants' efforts to have him present. The ATTD agent-in-charge in this area arranged for the informer's services while French was a prisoner in a Kentucky jail charged with a serious violation of the federal internal revenue liquor laws. There is a suggestion that this informer's compensation may have been contingent on his producing convicting evidence against persons denominated by the ATTD agents as major violaters. Because French was present and testified in earlier cases, it is reasonably inferable that the prosecution deliberately withheld him as a witness in these cases. The ATTD agent-in-charge testified to that effect in this manner:

"Q. * * * Where is Stokes [French] now?

"A. I do not know.

"Q. Did you try to get him to come down here and testify before this jury today?

"A. I did not.

"Q. All right, sir; did you want him here?

"A. I have no particular desire to have him here. * * *"

This witness testified that it is common practice for the Alcohol and Tobacco Tax Division agents to search for informers who are liquor law violaters and to employ them to assist the agents in making purchases of liquor from law violaters. He admitted: "The reason I hired Stokes French was because he was familiar with a great number of the liquor law violaters in Cocke County [Tennessee]. The reason we paid him was to ward off any obligation whatsoever from the Government to the informer. * * * I knew that he had had liquor dealings with these people in the

past, and that he was currently engaged in the liquor business and was currently informed as to who (sic) the violaters were * * *."

French knew these three defendants from the days when he, French, was also a law violater in Cocke County. He spoke their language and was familiar with all facets of their nefarious operations, including making arrangements for future "buys". The prosecution, evidently, was not pleased with French's past performances as one of its crucial witnesses. His bad reputation as a law violater was clear, and there is a hint that his gamut of crimes may not have been confined to liquor violations. While these defendants apparently trusted French as one of their breed, the juries might have questioned his credibility as a key witness. Paraphrasing language the Chief Justice quoted in Lopez, supra, French was close enough to the moonshiners to serve as bait, near enough to the criminal design so that the defendants would embrace him as a confidante, but too close to it for the Government to vouch for him as a witness. In view of these factors, the prosecution chose to withhold the testimony of the informer and to rely on the corroborating testimony of ATTD agents who accompanied French when the defendants were entrapped.

Defense counsel, thereby, was foreclosed from cross-examining French. The defendants, were deprived of French's testimony as to any ATTD pressure brought to bear to persuade him to turn informer and as to French's appeals to friendship and comraderie-in-crime to induce the defendants to violate the law.

This Court, from the outset, has been disturbed by the patent unfairness of ATTD agents' making any contingent compensation arrangements with informers as well as the withholding of their testimony after names of such informers had been endorsed on the indictments and informations returned in this jurisdiction. These activities by federal law enforcement officers raise serious questions in the Court's mind of fair play.

The trend of case law seems now to be toward imposing on trial courts the duty of protecting defendants from unfair conduct on the part of representatives of our Government in furnishing evidence of crime. In the light of that definite development, this Court foresees miscarriages of justice if the convictions of these defendants and others in like situations are permitted to stand. The Court knows of no manner in which satisfactory reparations can be made in behalf of defendants who, after incarceration, are found to have been wrongfully convicted. This Court, possessing the power to grant a new trial to prevent such potential miscarriages of justice under Rule 33, Federal Rules of Criminal Procedure, will grant these defendants new trials.

Counsel for the defendants, within ten (10) days from the filing of this opinion and agreeably with the local rules of this court, will present orders consistent with this opinion. Therein, the prosecution will be directed to offer J. S. French as a witness on any such new trials or, in advance thereof, to assign reasons why this cannot be done.