**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul PANCZKO, Defendant-Appellant.**

No. 15519.

United States Court of Appeals
Seventh Circuit.

Sept. 28, 1966.

Rehearing Denied Oct. 19, 1966.

Certiorari Denied Jan. 9, 1967.

See 87 S.Ct. 716.

Melvin B. Lewis, Chicago, Ill., Julius
Lucius Echeles, Chicago, Ill., of counsel,
for appellant.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., Gerald M. Werksman, Asst. U. S. Atty., of counsel, for appellee.

Before SCHNACKENBERG, SWYGERT and CUMMINGS, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Paul Panczko, defendant, appeals from a judgment of the district court convicting him on both counts of an indictment, which in count I charged him and Guy Mendola (who died before the return of the indictment), Paul Vincent Lacinak, Robert E. Connors and Granville Lee Turner, with a conspiracy to pass and sell certain counterfeit United States federal reserve notes. Trial was by jury. Several overt acts were alleged and reliance was placed on Title 18 United States Code § 371.

Panczko was charged in count II with a violation of § 473; 18 U.S.C. in that he did sell, transfer and deliver to Lacinak certain federal reserve notes, knowing them to be counterfeit.

Panczko was sentenced to imprisonment for five years on count I and ten years on count II, the sentences to run consecutively.

■ 1. The government called Lacinak and several others as its witnesses. We have examined this evidence and find that the jury was justified in finding that the evidence supports the charges against Panczko. It is not necessary to analyze that evidence in detail, with one or two exceptions.

We have already had occasion to consider the nature of the proof which meets the requirements in a prosecution such as this. In United States v. Crowe, 7 Cir., 188 F.2d 209, at 212 (1951), we said:

"The record discloses that Crowe had control or possession of counterfeit bills, such as those described in the indictment. They were of no value to him unless he could get them into circulation and realize cash, or something of value. He was the general distributor. All the bills in evidence were traced back to him. Adrian Higgins visited Crowe's home several times and came out with a quantity of the counterfeit bills, some of which he passed, some he sold or gave to others to pass. * * *"

Moreover, at 213, we added:

"* * * Overt acts of the parties may be considered with other evidence and attending circumstances in determining whether a conspiracy exists, and where the overt acts are of a character which are usually, if not necessarily done pursuant to a previous scheme and plan, proof of the acts has a tendency to show such pre-existing conspiracy, so that when proven they may be considered as evidence of the conspiracy charged. United States v. Holt, 7 Cir., 108 F.2d 365."

To the same effect is United States v. Morris, 7 Cir., 225 F.2d 91, 93 (1955), cert. denied, 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 792. We agree with government counsel that the evidence in the case at bar would support a reasonable inference that Mendola and Panczko, former prisonmates of Lacinak, gave Lacinak counterfeit money to pass in exchange for good money which they would share upon Lacinak's return to Chicago, and that the understanding among them was that Lacinak, with his wife and child as a cover, was to travel about the United States to accomplish a common purpose—to pass the counterfeit money and return with good money.

■ 2. We cannot agree with defense counsel that Panczko is entitled to have the judgment against him set aside on the ground that the government unreasonably delayed the bringing of its charges against him. They attempt to rely on the language of the sixth amendment to the constitution of the United States, because they say that it guarantees a "speedy" trial. However, they do admit that the indictment was returned within the period provided by the applicable statute of limitations. Certainly the government is entitled to a reasonable time in which to investigate a case such as this, and prepare it for prosecu-

tion, limited *only* by the statute of limitations.[1]

Many years ago Mr. Justice McKenna said in Beavers v. Haubert, 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950 (1905):

"  *  *  *  The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.  *  *  *  "

Mr. Justice White in United States v. Ewell, 383 U.S. 116, at 120, 86 S.Ct. 773, at 776, 15 L.Ed.2d 627 (1966) said:

"We cannot agree that the passage of 19 months between the original arrests and the hearings on the later indictments itself demonstrates a violation of the Sixth Amendment's guarantee of a speedy trial. This guarantee is an important safeguard to prevent undue and oppressive incarceration prior to trial to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself. However, in large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.  *  *  *  "

Defendant relies solely on Ross v. United States, 121 U.S.App.D.C. 233, 349 F. 2d 210 (1965). However the majority opinion in *Ross* points out at page 215 that in that case the record before the court showed

"  *  *  *  (1) a purposeful delay of seven months between offense and arrest, (2) a plausible claim of inability to recall or reconstruct the events of

the day of the offense, and (3) a trial in which the case against appellant consists of the recollection of one witness refreshed by a notebook.  *  *  "

■  We feel that, under all the circumstances, *Ross* is distinguishable from the case at bar. We therefore hold that there is no showing of any prejudice herein on this account which would justify our reversal of the judgment below.

3. On September 13, 1965, Panczko's attorney moved the district court to postpone trial of the case from October 18, 1965 to a subsequent date on the ground that "Life Magazine" in its issue of August 6, 1965 had publicized Panczko and his two brothers in such a manner as to make it impossible to impanel an impartial jury to try said defendant in the district court. That motion was denied and, on July 29, 1966, on motion of defendant's counsel, this court ordered the clerk of the district court to file with the clerk of this court the said motion of September 13, 1965, the exhibit ("Life" magazine article attached to said motion), and transcript of proceedings had on September 13, 1965. This was done.

We have examined the article in question. It is an interesting recital of alleged successive and unsuccessful efforts of the law enforcing agencies in Chicago to convict defendant Paul Panczko and his brothers, Joseph and Edward. It is accompanied by cartoons making for a larger circulation for the magazine. Thus one picture shows a man (evidently one of the brothers) riding on the handle of a screwdriver over the large buildings of the city by moonlight, with the caption "Any one of the three Panczko brothers can get more mileage out of an ordinary screwdriver than Stanley Tools has ever dreamed of."

The trial in the district court commenced on October 25, 1965. Then almost eleven weeks had already elapsed since the publication of the Life article. More-

---

1. Cf. Hoopengarner v. United States, 6 Cir., 270 F.2d 465, 469 (1959); Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808, 809–810 (1963), cert. denied, 379 U.S. 905, 85 S.Ct. 198, 13 L.

Ed.2d 178; Foley v. United States, 8 Cir., 290 F.2d 562, 565–566 (1961), cert. denied, 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed. 2d 88.

over, defendant did not represent that any publicity attributable to the Life article had so permeated the territory of the district court at the time of the trial as to prevent selection of an impartial jury and to require a continuance. Allen v. United States, 7 Cir., 4 F.2d 688, 697–698 (1924), cert. denied, Hunter v. United States, 267 U.S. 597, 45 S.Ct. 352, 69 L.Ed. 806. Nor did defendant seek removal of the case to another district under rule 21(a) of the Federal Rules of Criminal Procedure.

■■ We hold that the district court did not abuse its discretion in denying defendant's motion of September 13, 1965. We so hold although ordinarily such a decision is not reviewable by this court. Hart v. United States, 5 Cir., 112 F.2d 128, 131, 132 (1940), cert. denied 311 U.S. 684, 61 S.Ct. 60, 85 L.Ed. 441; Lias v. United States, 4 Cir., 51 F.2d 215, 217 (1931), affirmed 284 U.S. 584, 52 S.Ct. 128, 76 L.Ed. 505.

■ 4. When Gaetano Mendolia, father of Guy Mendola, was testifying for the government, he was, outside the presence of the jury, questioned by the court and thereby it was established that the witness was 73 years old. The inquiry by the court continued, the witness volunteering: "they killed him, * * * August 31st, 1965. * * *"

The court said "We won't talk about that. * * *, we don't mention that. Don't talk about this. Bring in the jury. Can he take the witness stand?"

The Witness: It is all right.

The Court: All right. You can turn him around and face the jury then. * * *

Whereupon Mendolia testified before the jury that he had seen defendant "maybe more than five times" during the period of several years. When asked "When was the last time you saw Paul Panczko?", the witness irrelevantly said

"When they told me, 'Your son is in Florida. He is going to get killed.' That is what they told me."

At the conclusion of his testimony one of counsel for defense moved for a mis-

trial and this was denied. He agreed that the volunteered testimony was "spontaneous and not attributable to anyone." Thereupon the court specifically instructed the jury in regard to the volunteered testimony given by Mendolia as aforesaid, telling them to erase it from their memories. The court again denied defense attorney's motion for a mistrial.

We are convinced that the jurors realized the emotional impact upon the aged Mendolia as he testified, and that they were able to differentiate between his responsive answers to the questions put to him and his nonresponsive answers attributable to his sorrow and resentment in the belief that his son had been killed.

*5. Finally, defense counsel complains that the instructions to the jury were prejudicially erroneous. We have examined them and hold that defense counsel are mistaken. In fact, the instructions are conspicuously free from error.*

For these reasons the judgment from which this appeal was taken is affirmed.

Judgment affirmed.