**UNITED STATES of America**
**v.**
**Bennie CURRY et al., Defendants.**
**No. 67 CR 248.**

United States District Court
N. D. Illinois, E. D.
May 6, 1968.

---

Thomas Foran, U. S. Atty., John Conlon, Asst. U. S. Atty., Chicago, Ill., for the Government.

Terence MacCarthy, Chicago, Ill., for defendant Curry.

R. Eugene Pincham, Chicago, Ill., for defendant McCorkle.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

Defendants' Post-trial motions

Defendants Bennie Curry and Eddie McCorkle are charged in a four count in-

dictment (No. 67 CR 248) with the sale and concealment of several quantities of heroin, in violation of 26 U.S.C. Sec. 4705(a), and 21 U.S.C. Sec. 174. Curry and four other defendants are charged in a separate indictment pending before this Court, (No. 67 CR 254), with conspiring to transfer a quantity of marijuana, in violation of 26 U.S.C. Sec. 4742 (a), and 18 U.S.C. Sec. 371. The second indictment is related to the instant case only insofar as both stemmed from the same narcotics investigation.

A joint trial before this Court, without a jury, was held several weeks ago, in 67 CR 248. Defendant Curry stipulated to his participation in the offenses charged in the indictment, but raised the defense of entrapment. Defendant McCorkle denied his guilt from the witness stand. We made findings of guilty as to both defendants. Both have now presented their post-trial motions.

### Defendant Curry's Motion for Judgment of Acquittal

Curry's motion for a judgment of acquittal is essentially hinged upon two crucial legal defenses—that of entrapment, and that of inordinate and prejudicial delay between the time of the offenses and the date he was notified of the instant indictment.

Earlier, Curry moved to dismiss the indictment (and also No. 67 CR 254) on the latter ground, alleging that he had been denied due process of law, and his Sixth Amendment right to a speedy trial, by the delay. In a Memorandum Opinion dated December 8, 1967, United States v. Curry, 278 F.Supp. 508, 510 (N.D.Ill.1967), we reviewed the facts, as known at that time, and concluded that defendant had not made a sufficient showing of prejudice to support either

his Fifth or Sixth Amendment arguments. In an affidavit in support of his motions, Curry suggested that he was prejudiced, inter alia, by his inability to locate a witness by the name of Jones "who was the apparent owner of a restaurant at 79th and Halsted in the City of Chicago". In our Opinion, we indicated that Curry had made an insufficient showing of prejudice, in part because he had not suggested why Jones was a material witness, or to what he would testify. But we stated that should Curry be able to amplify the prejudicial effects of delay at a later time, he could renew his motion for our consideration.

Subsequent events have amplified defendant's need for access to Jones. Those events and all of the facts relevant to the case, when considered, will show that the entrapment and delay issues are factually interrelated, and must be consolidated for discussion purposes. That is because Curry charges he was entrapped by Jones, a government informer, and to a lesser extent by Narcotics Agent Frank Boyles, but that the delay involved in notifying Curry of the charges deprived him of the opportunity to locate Jones, whose testimony would have been crucial to the entrapment defense.

Curry admits his participation in the sales of heroin to Agent Boyles on January 20 and February 17, 1966, as charged in the indictment. He denies receiving any money from the transactions, but alleges that he merely introduced Boyles to the person actually selling it (McCorkle).[1] He also admits supplying marijuana to Agent Boyles on December 16, 1965, January 5, 1966, and January 6, 1966.

But he charges, he was entrapped into making this entire series of transactions

---

1. During his testimony he did not identify McCorkle, and any attempts to do so by name were stricken from the record. Agent Boyles testified as to McCorkle's participation. Curry and McCorkle, of course, presented inconsistent defenses. Thus, certain evidence offered against Curry, and parts of his own testimony, which might have tended to incriminate

McCorkle, were admitted for the limited purpose of their applicability to Curry. Because the trial was before the Court, and without a jury, we indicated, as the trier of fact, that we would be able to segregate such evidence in our own mind so as not to prejudice McCorkle's defense.

by the missing witness Jones. He testified that he knew of Jones, who was a few years older than he, since their younger days when they grew up in Clarksdale, Mississippi. He did not actually know him in Mississippi, but knew of him, and they shared certain mutual friends there. Curry subsequently moved to Chicago. At some point, he discovered that Jones ran a small restaurant on 79th Street in Chicago. Curry was a marijuana smoker. He testified that Jones had access to marijuana and was a ready source of supply for Curry's own needs.

According to Curry, one day Jones asked him if he could get any marijuana for Jones' "boss" Frank (who subsequently turned out to be Agent Frank Boyles). Curry apparently was somewhat taken aback since Jones had been *his* supplier. So he expressed his incredulity and said he did not know where to find any marijuana since he came to Jones for his own. Jones apparently explained that his supply of marijuana was not sufficient to satisfy the quantity desired by Frank. Jones allegedly asked him several more times to find some marijuana for Frank, and Curry repeatedly told him he had no sources other than Jones himself.

Curry was self-employed as a peddler of clothes at the time. He bought clothes from retail and wholesale houses, and resold them to his customers. He testified that one of his customers, a man by the name of "Charles", owed him $80 in December, 1965. Charles allegedly told Curry he had found a supply of marijuana growing wild beside a South Side railroad track. With this knowledge, Curry thought he had found the way to receive his $80. He would get Charles' marijuana to Jones and Frank, collect his $80, and Charles would get the remainder of the money. Curry then told Jones he had access to a supply of unprepared marijuana. Curry delivered the marijuana to Jones who weighed and prepared it, and the sale was made to Boyles. However, in testimony not controverted by Boyles, Curry stated that Boyles indicated he did not want the full supply at the time of the initial sale. Therefore, according to Curry, in somewhat incredible fashion, Curry stashed the remainder of the marijuana in a stairwell of a housing project at 62nd Street and South Park. He gave no explanation why he took the marijuana to that location when he lived at 82nd and Ellis, and received it from Charles south of 62nd and South Park, somewhere near 71st and Jeffrey.

Boyles, who as "Frank", was at that time known to Curry as Jones' "boss" through Jones' introduction, arranged and consummated two more sales of marijuana with Curry, receiving the marijuana Curry had hidden. Curry testified he received no money from these sales, but there is no explanation as to who did ultimately receive Boyles' payment.

Later in January, Boyles asked Curry if he could get him any heroin. Curry allegedly told him he had no access to heroin, did not use it, and did not know where to find it. Boyles continued to ask Curry for heroin, so Curry told Jones and asked him whether he should help Boyles find some heroin. Jones allegedly told him to do so. Jones apparently knew of Curry's longtime acquaintance with McCorkle, stemming from their school days, believed that McCorkle had access to heroin, and suggested that Curry contact McCorkle to secure heroin. Curry had not seen McCorkle for quite some time and apparently did not know he dealt in narcotics, but eventually he did introduce Boyles to McCorkle, and on January 20 and February 17, 1966, the sales to Boyles took place. Curry testified that he received nothing from the transactions, and just helped Boyles because he had continually asked Curry to find heroin. In short, Curry said, after repeated entreaties from Boyles, he set up the introduction to McCorkle as an accommodation.

The thanks he received was the return of the instant indictment. But not for 15 months after the second offense. The indictment was returned only on May 2, 1967. Curry was not arrested on that

indictment until sometime in September or October of 1967. He never appeared before the Commissioner, and first appeared in this court for arraignment and plea on October 10, 1967. Thus, approximately 20 months elapsed from the date of the offenses to the time defendant was notified of the charges against him.

From the facts as related above, it appears that the presence of Jones at these proceedings could perhaps have cleared up some of the evidentiary voids that now exist. There was a tactical reason why Curry was not in a position to more fully amplify his need for Jones in his pretrial motion to dismiss. To state that Jones was needed to corroborate an entrapment defense would be to admit his participation in the offenses charged. Also, and perhaps even more important, Curry was not completely certain at that time that Jones had been a government informer. For whatever tactical reason, Curry's counsel was unwilling to disclose his client's hand in the motion—a perfectly proper position to take. But after we issued our ruling on December 8, 1967, in which Curry's motion to dismiss was denied, we held an informal pretrial conference on December 13, 1967, at Curry's counsel's request. Therein, he explained the importance of Jones' testimony, off the record, and expressed his uncertainty as to whether Jones, in fact, was a government agent. He explained that Curry, who had been out on bond in this case until arrested on another charge, had looked diligently for Jones, as had several of his friends, but he was nowhere to be found. The prosecutor refused to unequivocally disclose to the court whether Jones was an informer. We then instructed him to produce Jones at the trial for examination by Curry's counsel, if Jones was an informer. The government advised the Court that Jones would be produced if he was an informer.

But the prosecutor failed to produce Jones. On the eve of trial the government tendered its proposed stipulation of facts to Curry's counsel. It indicated that an "Ernest Jones" introduced Curry to Agent Boyles. That was the first direct indication by the Government that it knew anything about Jones, including his first name. Defense counsel understandably again inquired of the government what it knew of Jones. For the first time, the government admitted he was a government informer. Moreover, the government waited until the day of trial to reluctantly admit through its agents' testimony, that it had made absolutely no effort to locate Jones. Indeed, none of the three agents who testified even knew the defendant was looking for Jones, or were aware of the Court's direction to the prosecutor, and they admitted that the government had made no attempt to keep track of or locate him. In response to our expressions of dissatisfaction with the failure to produce Jones, or to look for him, as we previously directed, the prosecutor suggested that Jones was unimportant to the defendant, and was no more than a "red herring" to Curry's defense. Pursuant to our direction, the government then looked for Jones for a day and a half prior to the actual commencement of trial, but could find no trace of him.

During the trial, it came out that Jones not only was a government informer, but had been used to "make" cases for the government. He was out on bond on a federal complaint charging a narcotics violation, and under his arrangement with the Bureau of Narcotics, was led to believe his case would be dismissed if he provided the government with new cases. It was testified at trial that Jones did provide the government with at least three new cases, including this one, and the complaint against him was subsequently dismissed by the United States Attorney upon the recommendation of Narcotics Agent Connolly.

■ It should be evident from the foregoing factual summary that serious questions are posed by the instant motion, both with regard to entrapment and delay. However, we do not agree with defense counsel that entrapment has been established as a matter of law. Judge Learned Hand stated the classic

definition of entrapment in the Second Circuit decision of United States v. Sherman, 200 F.2d 880, 882–883 (2d Cir. 1952):

"Therefore, in such cases two questions of fact arise: (1) did the agent induce the accused to commit the offense charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense. On the first question the accused has the burden; on the second the prosecution has it."

The Supreme Court approved that definition when the *Sherman* case ultimately reached it after a new trial. Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

There was admittedly no evidence that Curry had a past record of conviction for any crime. He testified that he smoked marijuana, but the Government presented no evidence to show that he had *sold* narcotics in the past. The record is barren of any evidence that he ever was in the narcotics traffic.[2] Of course, the Supreme Court has already made clear that even a record of prior sales of heroin does not necessarily support the conclusion that the defendant had a propensity to sell heroin. Sherman v. United States, supra, 356 U.S. at 375, 78 S.Ct. 819. On the other hand, there is always a first time, and a defendant need not have a past record of similar conduct in order to be predisposed toward committing the specific crimes charged.

Initially, we must consider whether Jones or Boyles induced Curry to sell the heroin. It was Curry's testimony that Jones continually urged him to find some marijuana, and that he did so only at Jones' repeated insistence; that after he had supplied Jones and Boyles with marijuana, Boyles asked him to locate heroin, although Curry disclaimed any interest in or information regarding heroin; that Jones told him he should help Boyles secure heroin, and suggested that Curry introduce Boyles to McCorkle, who Jones thought had a supply of heroin; that Curry had not seen McCorkle for some time, and did not know he dealt in heroin, but finally introduced Boyles to him, was present when the sales charged in this indictment were made, but received no money from the transactions, or from the marijuana sales, save the $80 owed to him by "Charles".

The evidence disclosed by Government witnesses showed that Jones was a user and seller of narcotics, was the subject of a federal narcotics complaint filed with the United States Commissioner, and was working for the government on a basis whereby he would "make" new cases in return for the dismissal of the complaint. Agent Boyles, who is an experienced and highly respected narcotics agent, testified that he purchased marijuana from Curry on the three occasions aforementioned, that Curry seemed disposed to sell it without any urging on Boyles' part, that after Boyles asked Curry if he had access to heroin, Curry introduced him to Eddie McCorkle, was able to state a price of $75 "a spoon", and needed no undue coaxing to become involved in the transactions.

Although the instant indictment is concerned with sales of heroin, we think the overall relationship between Curry, Jones and Boyles including the sales of marijuana, is relevant to the issue of entrapment as it pertains to the heroin transactions. The Supreme Court has held that sales made subsequent to an initial entrapment need not be independently induced where they are

---

2. The Government introduced no evidence that Curry has any record of past convictions. Agent Connolly testified that it was his understanding that Curry had some past arrests, but that the police records were in confusion between Curry and a friend, Bennie Bradley, a co-defendant in 67 CR 254. Curry testified that he had no record of convictions. The evidence is clear, therefore, that Curry has no record of convictions, and consequently none involving marijuana, either as a seller or possessor.

part of the course of conduct which was the product of the initial inducement:

> "It makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement." Sherman v. United States, 356 U.S. 369, 374, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

The record in this case discloses that the various sales of marijuana and heroin were all part of a continuous relationship between Jones, Boyles and Curry, and it is likely that both the marijuana and heroin transactions were induced by the same course of conduct.

Curry's testimony regarding Jones' inducements to furnish marijuana are uncontradicted in the record. The only person in a position to confirm or deny such evidence, unfortunately, is the mysterious and missing Jones. Agent Boyles testified that Curry was ready and willing to transfer the marijuana to him, and although Boyles admittedly asked Curry to supply him heroin, he stated that Curry was receptive to his requests. In this posture of the case, the element of inducement is unchallenged. However, from observations of Curry's demeanor, we have grave reservations as to his credibility, while we have none as to Agent Boyles, who impressed us as a conscientious and candid spokesman. Thus, on the present record, even conceding Curry's characterization of Jones' status as a "contingent-consideration" informer, we are unable to conclude that the inducements exercised were "shocking or offensive per se." See Whiting v. United States, 321 F.2d 72 (1st Cir. 1963). We will have more to say about Jones' relationship with the Government in considering the issue of delay.

■ The remaining entrapment issue, therefore, is whether Curry was sufficiently predisposed, so that while Jones and/or Boyles induced him to take part in the transactions, his own inclination to involve himself was responsible for

his conduct. Once inducement is shown, the Government has the burden of proof to show beyond a reasonable doubt that the defendant was "ready and willing" and "awaiting any propitious opportunity to commit the offense." United States v. Landry, 257 F.2d 425, 430 (7th Cir. 1958); Notaro v. United States, 363 F.2d 169, 174 (9th Cir. 1966); Waker v. United States, 344 F.2d 795, 796 (1st Cir. 1965); Lunsford v. United States, 200 F.2d 237, 239–240 (10th Cir. 1952).

■ No predisposition can be shown here from a prior record, for of course, Curry has none. But the following quotation from Waker v. United States, supra, 344 F.2d at 796–797, is instructive:

> "However, such predisposition may be inferred from the circumstances themselves. Defendant's concept that 'an established pattern of continuing criminal conduct' must be found is erroneous. As we pointed out in Whiting, supra, entrapment is allowed as a defense not because the defendant has not committed the acts constituting the crime, but because entrapment, as legally defined, is unacceptable to a sense of justice and fair play. It would be excessive to extend it to a defendant who showed himself ready and willing, and merely had to be persuaded that this was a safe opportunity to commit the offense. In such circumstances we would not impose on the government the very heavy burden of proving beyond a reasonable doubt that the defendant was a habitual offender, or even that he was a prior offender at all. * * *"

The testimony on this record as to Curry's predisposition is in conflict between Curry and Boyles, and that conflict is further aggravated by the totally unexplained and inexcusable absence of Jones from these proceedings. Because of the testimonial conflict, we do not believe entrapment could be established here as a matter of law, as it was in Morales v. United States, 260 F.2d 939 (6th Cir.

1958). Rather it can be established, if at all, as a matter of fact.

The facts of Morales are remarkably similar to the ones at bar (260 F.2d at 939–940):

> "The appellant testified that he met Tony Gutierrez, a special employee or undercover agent of the Government, some three months before his arrest. Following this meeting, the appellant saw Gutierrez three or four times a week in the Mexican community of Detroit. Following the first meeting, Gutierrez repeatedly asked the appellant if he could get any marijuana. Appellant invariably replied that he did not know where to get it and did not know 'that kind of business'. Following successive answers of like tenor, this appellant was told by Gutierrez that he would purchase any quantity that he could get. Some time later, he was told by a man named Rivas, or Rivera, of a place where marijuana was growing wild. Appellant went to a man named Mosko to see if what appellant thought to be marijuana really was. Mosko advised Morales that it was marijuana and volunteered information how to dry it. When Morales finally entered the transaction he was out of work and had a family to support. When asked if he would have sold marijuana if he had not met Gutierrez he replied: 'I don't think so'. The Government did not produce Gutierrez as a witness. * * * "

Morales had no criminal record, had had no contact with persons engaged in narcotics traffic, and had never sold or used marijuana. He testified "that he had never considered dealing in marijuana before he met Gutierrez; that Gutierrez kept on asking him to get some marijuana so that they could make money; that he was at that time out of work, had a family to support, and was told that getting the narcotic 'was easy'". (260 F.2d at 940).

On that record, the Court held entrapment was established as a matter of law. Morales' testimony was uncontroverted.

He was the sole witness thereto, and was not cross-examined with respect to it. And as already stated, the Government did not produce Gutierrez as a witness.

But unlike *Morales,* a federal narcotics agent (Boyles) was involved here, in addition to the undercover agent Jones. And Boyles' testimony conflicted with Curry's assertion that he was not predisposed to commit the crimes. Furthermore, Curry was cross-examined, and the Court was not impressed with his demeanor. Thus unlike *Morales,* issues of fact regarding predisposition are present here, which prevent the Court from upholding the entrapment defense as a matter of law. See Masciale v. United States, 356 U.S. 386, 388, 78 S.Ct. 827, 2 L.Ed.2d 859 (1958).

The absence of Jones leaves much to be desired for it creates a considerable evidentiary void. And the Court is inclined to view that part of Curry's testimony which is uncontroverted as less than gospel truth. Nevertheless, Agent Boyles' testimony was sufficiently convincing that were we forced to rule on the entrapment defense, we would probably find that Curry was ready and willing, and therefore, predisposed, to commit the offenses, even though initially he was hesitant. The "bait" was placed, and Curry saw a chance to make some money. We are not willing to credit Curry's testimony that he made no money other than $80 from the various transactions. Although there is no concrete evidence to the contrary, we find the circumstances surrounding the second and third sales of marijuana so incredible, as to warrant believing beyond a reasonable doubt that Curry did in fact make more than $80 from the various transactions.

However, because of our disposition of this motion on other grounds, infra, we need only intimate our feelings on the issue of entrapment without actually rejecting the entrapment defense as a basis of decision. The foregoing discussion, however, was important to our consideration of the delay issue, which fol-

lows, for it illustrates the crucial importance of the witness Jones to Curry's defense.

■ Two distinct grounds are asserted in support of Curry's contention that the delay between the last offense (February 17, 1966) and the date he was arrested and thereby notified that the instant indictment had been returned (late September, or early October 1967), was prejudicial.[3]

We believe the principles espoused by Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965), and its progeny,[4] govern the case at bar. In *Ross*, the Court dismissed a narcotics indictment on Fifth Amendment grounds on a record which showed "(1) a purposeful delay of seven months between offense and arrest, (2) a plausible claim (by the defendant) of inability to recall or reconstruct the events of the day of the offense, and (3) a trial in which the case against appellant consists of the recollection of one witness refreshed by a notebook." (349 F.2d at 215.) The Court recognized that despite the public interest in undercover narcotics investigations as a means to detect violations of the narcotics laws (349 F.2d at 213):

> "The Constitution contemplates a separate interest in fair procedures for the citizen faced with the loss of his liberty by reason of criminal charges. When interests of this nature impinge upon each other, as they have a way of doing, they must be accommodated. A balance must be struck, if one or the other is not to be sacrificed completely. We see no inevitable necessity for such a sacifice here. Certainly there need be none if the Police Department in pursuing the one interest is not wholly oblivious of the other."

As explained further by Chief Judge Bazelon in Woody v. United States, 125 U.S.App.D.C. 192, 370 F.2d 214 at 216 (1966):

> "To strike this balance the court in *Ross* looked to two factors—the prejudice to the defendant stemming from the method of investigation and the reasonableness of the police conduct. Our discussion of prejudice in *Ross* and the subsequent Narcotics Delay cases was framed primarily in terms of the ability of the accused to prepare

---

3. Curry also charges that the delay from the time he was first notified of the pendency of the charges against him, to the date of trial, April 1, 1968, contributed to the prejudice he allegedly suffered. Although delays between arraignment and trial certainly can form the basis for dismissal of an indictment, see e. g., United States v. Chase, 135 F.Supp. 230 (N.D.Ill.1955), and United States v. Provoo, 17 F.R.D. 183 (D.Md.1955), in the instant case we are primarily concerned with the 20 month delay between the offenses and the date Curry was notified of the charges therefor. United States v. Curry, 278 F.Supp. 508 (N.D. Ill.1967); See also Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808 (1963), where the court concluded that the combined pre-prosecution and post-prosecution delays had denied the defendant his right to a speedy trial. United States v. Burke, 224 F.Supp. 41 (D.D.C.1963); Hardy v. United States, 119 U.S.App.D.C. 364, 343 F.2d 233, 234 (1964) (dictum); Sanchez v. United

States, 341 F.2d 225, 228 n. 3 (9th Cir. 1965) (dictum); United States v. Parrott, 248 F.Supp. 196, 202 (D.D.C.1965) (dictum).

4. E. g. Woody v. United States, 125 U.S. App.D.C. 192, 370 F.2d 214 (1966); Hood v. United States, 125 U.S.App.D.C. 16, 365 F.2d 949 (1966); Morrison v. United States, 124 U.S.App.D.C. 330, 365 F.2d 521 (1966); United States v. Sanchez, 361 F.2d 824 (2d Cir. 1966); United States v. Hammond, 360 F.2d 688 (2d Cir. 1966); Bey v. United States, 121 U.S.App.D.C. 337, 350 F.2d 467 (1965); Roy v. United States, 123 U.S.App.D.C. 32, 356 F.2d 785 (1965); Jackson v. United States, 122 U.S.App.D.C. 124, 351 F.2d 821 (1965); Cannady v. United States, 122 U.S.App.D.C. 120, 351 F.2d 817 (1965); Mackey v. United States, 122 U.S.App.D.C. 97, 351 F.2d 794 (1965); United States v. Godfrey, 243 F.Supp. 830 (D.D.C.1965); Terlikowski v. United States, 379 F.2d 501 (8th Cir. 1967) (dictum).

and present a defense at trial. But the ultimate prejudice that has concerned us in these cases has been the risk of erroneous conviction attributable to the process which led to the verdict of guilt. Delays prior to arrest which hinder or prevent presentation of a defense shackle our system of determining truth through the adversary process. The reliability of the verdict then depends solely upon the quality of the police identification. The more inherently unreliable the method of identification, the more the ultimate prejudice—the risk of erroneous conviction."

The substantive defense in issue in this case is entrapment. We have already demonstrated the valuable light Ernest Jones could have shed on that aspect of the proceedings. Inter alia, he could have testified regarding the following: (1) the nature and degree of the inducement to Curry by Boyles and Jones; (2) whether Curry had a predisposition to sell narcotics; (3) the terms of the sales and who arranged them; (4) who received the money from the sales, and; (5) Curry's comments relative to his participation in the sales.

Without Jones' testimony, the Court must confess, its evaluation of the entrapment issue is grounded largely upon conjecture and surmise, based primarily upon the relative credibility assigned to the testimony of Curry and Boyles. Such a basis for decision is wholly unsatisfactory and denies the defendant the essentials of a fair hearing, where through the Government's inaction, he was deprived of the opportunity to secure Jones as a witness. Also, the alleged initial supplier of marijuana, Charles, could not be found after Curry was notified of the charges against him. His testimony would also have helped fill in the empty spaces in the evidentiary picture. Indeed, the same rationale which led to the *Ross* result—the potential unreliability of the verdict—applies here as well. For the ultimate prejudice herein is the "risk of erroneous conviction attributable to the process which led to the verdict of guilt." (Woody v. United States, 125 U.S.App.D.C. 192, 370 F.2d 214, 216 (1966). Whereas *Ross* involved a defect in the method of identification, this case involves a void in the evidence relating to the key issue of entrapment.

The twenty month delay in notifying Curry of the pendency of these charges is responsible for his present inability to locate Jones. No plausible justification has been offered for the delay. The Government claims it was occasioned by a large turnover in the staff of the United States Attorney. Curry claims it resulted from the Government's attempt to secure his services as an undercover informer, of the same category as Jones.[5] First of all, at least two federal courts have indicated that negligence by the government is an improper reason for delay. See Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363, 368 (1965); United States v. Parrott, 248 F.Supp. 196, 204 (D.D.C.1965). In *Parrott*, the court indicated that "(t)he Government has not adequately justified the delay. As to the twenty-two months' delay wherein the matter was in the hands of the United States Attorney, the only excuse that the Government has tendered is the pressure of work in the U. S. Attorney's Office".

---

5. Lest there be no misunderstanding, Curry was apparently unaware of the charges in this indictment during the pre-indictment period. He is also a defendant in 67 CR 254, a pending prosecution, involving certain sales of marijuana occurring between March 14 and 16, 1966. He was arrested on that charge on March 16, 1966, and appeared before the Commissioner to answer a complaint on March 17, 1966. He testified that while *that* charge was pending, agents of the Federal Bureau of Narcotics sought to enlist his services as an informant. He says he was not informed of the charges which appear in the instant indictment until arrested in October, 1967, even though they were known to the Government during 1966. For more factual information regarding the pre-prosecution periods in both indictments, see our opinion of December 8, 1967.

Although we do not indicate disbelief of the Government witnesses who testified that no overtures were made to Curry to become an informer, we can take judicial notice of the fact that it is a practice of the Narcotics Bureau to secure informants from among persons charged with narcotics crimes. Whether Curry was so solicited we express doubt. But delay is not justified if the Government has made "a deliberate choice for a supposed advantage." United States v. Burke, 224 F.Supp. 41, 46 (D.C.1963); United States v. Provoo, 17 F.R.D. 183, 195 (D.Md.1955); United States v. Parrott, 248 F.Supp. 196, 209 (D.D.C.1965). Thus if a reason for delay was to secure Curry's help as an informer, it would be improper delay, especially where he was unaware of the charges pending against him.

In any event, no satisfactory explanation of the delay has been offered by the Government.

Furthermore, there has been no explanation by the Government for its failure to produce Jones, or if that was impossible, for its utterly unprofessional failure to comply with the Court's direction that it make reasonable efforts to locate him.

In United States v. Clarke, 220 F. Supp. 905 (E.D.Pa.1963), the defense of entrapment was raised to a narcotics conspiracy charge. One Flores, a former close friend and relative of the defendant, was the government informant, who defendant claimed had entrapped him. Flores was not produced at trial, even though he had been present on all but one of the five occasions when defendants made illegal sales.

■ In language peculiarly apropos, the Court stated (220 F.Supp. at 908):

" * * * We think common fairness made it the Government's duty to produce Flores at the trial, or, failing that, to show that reasonable efforts to produce him were fruitless. It is hornbook law that normally all eye witnesses should be called, unless the prosecutor has them in Court and advises the defendant that he will not call

them. Commonwealth v. Sarkis, 164 Pa.Super. 194, 199, 63 A.2d 360 (1949). Apart from other considerations, Flores was the only person, except for defendants themselves, who could have shed light on the issue of entrapment. According to Agent Cockerille, Flores ceased to be a special employee of the Bureau 'immediately after this case that is on trial here today.' (p. 201 [,63 A.2d 360].). The Government may not disown Flores and insist it is not responsible for his actions. Sherman v. United States, 356 U.S. 369, 373, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). If Flores had been in Court, as he should have been, if available, we might well have ordered the Government to call him, as would have been our right. 23 C.J.S. Criminal Law, § 1017, p. 1097."

Accord: United States v. Ramsey, 220 F.Supp. 86, 90 (E.D.Tenn.1963).

The Court went on to demonstrate that the Government had not shown reasonable efforts to produce Flores at the trial, and concluded (220 F.Supp. at 909):

"Candor compels us to note that Agent Cockerille seems to have experienced little difficulty in locating Flores when he needed his services as a 'special employee' a year earlier."

We have already expressed our displeasure with the lack of effort expended by the Government counsel in attempting to locate Jones for this trial. He has known of the importance of Jones at least since October 27, 1967, when Curry initially filed his motion to dismiss, wherein he stated he only knew Jones by his last name and last known address. In Answer to Curry's motion, the Government's brief suggested that Curry make a greater showing of materiality and prejudice. It now appears that Government counsel knew much more about Jones at that time than did Curry. Indeed, Agent Boyles testified that he last saw Jones about a year ago, which would have been April, 1967, shortly before the indictment was returned. Even had Curry been told of the indictment soon

after its return, he might have had better success in locating Jones. As it was, when he was informed of the charges 20 months after the offenses, and five months after the return of the indictment, he and his friends mounted a diligent but fruitless search.

Finally, on December 13, 1967, after Curry's counsel explained Jones' importance to the Court in detail, we directed Government counsel to attempt to locate him if he was in fact a government informer. But incredulously, the prosecutor failed to expend a single effort in that direction, not even going so far as to inform the Narcotics Bureau of the need for Jones. Contrast this with the futile efforts to locate Flores made by Government personnel in United States v. Clarke, supra, which the Court nevertheless held did not constitute "reasonable efforts."

The Government's day and a half effort on the eve of trial, at the Court's direction, after the prosecutor admitted his failure to look for Jones, will receive as short shrift here, as it did in *Clarke*. See 220 F.Supp. at 909. Even if counsel really believed Jones was a "red herring," the Court and defense counsel obviously did not, and it borders on the contemptuous, for him to disregard our direction. Then for him to state, in apparent seriousness, in his brief on the instant motion, that "Jones must be deemed as a practical matter unobtainable" and "(p)eople like Jones are either around or lost," manifests an additional display of professional irresponsibility. We suggest he read the Supreme Court directives in such cases as Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), and Giles v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). Suffice it to say, that the Government failed to demonstrate a reasonable effort to locate Jones. See United States v. Jones, 360 F.2d 92, 95 (2nd Cir. 1966); Velarde Villarreal v. United States, 354 F.2d 9, 13 (9th Cir. 1965).

Finally, the need for Jones' presence in these circumstances, is underscored by his status as an informer working for "contingent consideration." In Williamson v. United States, 311 F.2d 441 (5th Cir. 1962), the Fifth Circuit condemned the practice of using informers to produce "new cases" in return for contingent consideration, unless sufficient justification or explanation is offered. The evil, of course is that the informer is paid only for evidence of crimes not yet committed when the agreement is sealed. The danger is that an unscrupulous informant may well resort to creating new crimes by entrapping unwitting parties, rather than finding legitimate cases of crime. In *Williamson*, and in United States v. Ramsey, 220 F.Supp. 86 (E.D. Tenn.1963), which also condemned the use of contingent consideration informers, the courts were also concerned with the failure of the Government to produce the informants as witnesses at trial.

Unlike *Williamson*, where the government had certain knowledge that defendants were engaged in illicit liquor dealings, the Government admitted here that it had no knowledge of any activity by Curry in the narcotics traffic when the arrangement with Jones was made.

Furthermore, the type of arrangement Jones had with the Government is even more fraught with danger than were he simply contingently employed for monetary consideration. His consideration was far more precious than money. Liberty was his objective, in the form of a dismissal of the complaint against him. What concern might he have for Curry, were the reward for Curry's incarceration his own liberty? When dealing with narcotics informants, the Court can almost take judicial notice of the lack of honor among scoundrels.

Of course, it might not have been that way at all. Jones may have not entrapped Curry in the slightest. But surely Curry should not be denied the opportunity to prepare and establish his defense by the best possible evidence—that of Jones' testimony.

No justification for the contingent arrangement with Jones was offered by the Government. Prior knowledge that the accused Curry is committing an unlawful act, would likely be a sufficient explanation. See Williamson v. United States, 311 F.2d 441, 444–445 (5th Cir. 1962); Hill v. United States, 328 F.2d 988, 989 (5th Cir. 1964). But there was no indication of Curry's past or present participation in the narcotic traffic. Thus the justification suggested in *Williamson,* and given effect in *Hill,* supra, can have no application here, and the practice employed must be disapproved in these circumstances.

■ When we couple the delay, to the form of Jones' arrangement with the Narcotics Bureau, and compound it with Jones' unexplained absence and the prosecutor's conduct herein, we believe the risk of an erroneous conviction is great, and the process which would lead to such a verdict is undeniably unreliable. In our judgment, the bounds of due process have been transgressed, and the conviction cannot stand.

We, therefore, do not reach Curry's argument under the Sixth Amendment. It might be noted that this Circuit has not extended the right to a speedy trial, guaranteed by the Sixth Amendment, to the pre-indictment stage of the proceedings. United States v. Panczko, 367 F.2d 737 (7th Cir. 1966), cert. denied 385 U.S. 1009, 87 S.Ct. 716, 17 L.Ed.2d 546 (1967); see United States v. Deloney, 389 F.2d 324 (7th Cir. 1968). Most other Courts have applied the same rule.[6] But in view of the special circumstances of this case we conceivably could have justified our present decision under the Sixth Amendment as well, if it had been necessary.

The motion for a judgment of acquittal as to defendant Bennie Curry is sustained and the finding of guilty entered previously is vacated.

The Court expresses its appreciation to Mr. Terence MacCarthy of the Federal Defender Program, who represented Mr. Curry herein, for his excellent and conscientious work on this case.

### Defendant Eddie McCorkle's Post Trial Motions

The motions of Eddie McCorkle to set aside the finding of guilty, to dismiss the indictment, and for a new trial are denied.

---

6. Parker v. United States, 252 F.2d 680 (6th Cir. 1958), cert. denied, 356 U.S. 964, 78 S.Ct. 1003, 2 L.Ed.2d 1071 (1958); Terlikowski v. United States, 379 F.2d 501, 504 (8th Cir. 1967); Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808, 810 (1963), cert. denied 379 U.S. 905, 85 S.Ct. 198, 13 L.Ed. 2d 178 (1964); Harlow v. United States, 301 F.2d 361 (5th Cir. 1962), cert. denied 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed. 2d 56 (1962); Hoopengarner v. United States, 270 F.2d 465 (6th Cir. 1959); Foley v. United States, 290 F.2d 562 (8th Cir. 1961). See United States v. Ewell, 383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed. 2d 627 (1966).

But cf. Hood v. United States, 125 U.S. App.D.C. 16, 365 F.2d 949, 950 (1966). And see Mann v. United States, 113 U.S. App.D.C. 27, 304 F.2d 394, 396–397, cert. denied 371 U.S. 896, 83 S.Ct. 194, 9 L.Ed.2d 127 (1962); Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808, 812 (1963) (concurring opinion of Judge Skelly Wright); Cannady v. United States, 122 U.S.App.D.C. 120, 351 F. 2d 817, 820 (1965) (Fahy, J. concurring); Hardy v. United States, 119 U.S. App.D.C. 364, 343 F.2d 233, 235 (1964) (Bazelon, C. J., dissenting from a denial of a motion for rehearing en banc), cert. denied 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276 (1965).

An excellent note catalogs the various decisions on this point, and suggests persuasive arguments in favor of extending the Sixth Amendment guaranties to the pre-indictment stages. Note, The Right to a Speedy Trial, 20 Stan.L.Rev. 476 (1968); see also Note, Justice Overdue—Speedy Trial for the Potential Defendant, 5 Stan.L.Rev. 95 (1952).