[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13474
_____

D.C. Docket No: 0:12-cr-60018-WPD-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ESNEL ISNADIN,
KAMENSKY GUSTAMA,
JOLENS CIUS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(February 12, 2014)

Before TJOFLAT and WILSON, Circuit Judges, and PROCTOR,[*] District Judge.

PROCTOR, District Judge:

_____

[*] The Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

It has been said the first rule of modern warfare is, "Don't bring a knife to a gun fight." In this case, an undercover ATF[1] agent made contact with two of the Appellants in this case, Jolens "Blunt" Cius and Kamensky Gustama, and offered them an opportunity to rob a stash house.[2] In doing so, the agent made clear that those who guarded the controlled substances were armed. Therefore, when Cius and Gustama explored alternative approaches to an armed robbery, the agent offered a similar warning about the need for weapons: "You got to [expletive deleted] rob them, bro." At trial, Cius and Gustama, along with their co-Appellant Esnel Isnadin, claimed they were entrapped. This appeal follows their conviction on some, but not all, of the charges in the indictment.

Cius, Gustama, and Isnadin raise a number of challenges to their respective convictions. Cius and Gustama[3] contend that the district court's response to a question posed by the jury instructing them to consider the entrapment defense separately and individually as to each count was erroneous. Gustama also argues that the evidence was insufficient to support his convictions and that he was entrapped as a matter of law, and thus the district court erred in granting his

---

[1] Bureau of Alcohol, Tobacco, Firearms, and Explosives.

[2] The "Appellants" in this case are Cius, Gustama, and Esnel Isnadin.

[3] Gustama has moved to adopt relevant portions of Cius's brief and reply brief outlining these arguments. The Court **GRANTS** that motion and will address the subject arguments as to both of these Appellants.

motions for a directed verdict.  Additionally, Isnadin maintains that his convictions should be vacated because he was a victim of derivative entrapment.  After thorough review, and with the benefit of oral argument, we conclude that (1) the district court did not abuse its discretion when it instructed the jury to consider entrapment separately as to each count, and (2) sufficient evidence supports the convictions.  Accordingly, we affirm.

## I.  BACKGROUND

### A.    Procedural History

In March 2012, a federal grand jury in the Southern District of Florida returned a nine-count superseding indictment.  Count 1 of the superseding indictment charged the Appellants Cius, Gustama, and Isnadin, and their co-defendant Marcus McKnight with conspiracy to commit a Hobbs Act robbery, in violation of 18 U.S.C. §1951(a).[4]  Count 2 charged Cius, Gustama, Isnadin, and McKnight with conspiracy to possess with the intent to distribute five kilograms or

---

[4] Title 18 U.S.C. § 1951(a) states in relevant part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (2006).

3

more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1),[5] (b)(1)(A),[6] and 846.[7]

Count 3 charged them with attempting to possess with the intent to distribute five

kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A),

and 846.  Count 4 of the superseding indictment further charged Cius, Gustama,

Isnadin, and McKnight with conspiracy to use and carry a firearm during and in

relation to the crime of violence charged in Count 1, and during and in relation to

the drug trafficking crimes charged in Counts 2 and 3, in violation of 18 U.S.C. §§

924(c)(1)(A)[8] and 924(o).[9]  Count 5 charged them with carrying a firearm during

---

[5] Title 21 U.S.C. § 841(a)(1) provides in relevant part that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally…to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. . . ."  21 U.S.C. § 841(a)(1) (2006).

[6] Title 21 U.S.C. § 841(b)(1)(A) establishes the penalties for a violation of § 841(a), which are dependent upon the type and amount of the controlled substance.

[7] Title 21 U.S.C. § 846 states that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  21 U.S.C. § 846 (2006).

[8] Title 18 U.S.C. § 924(c)(1)(A), provides in relevant part:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime…be sentenced to a term of imprisonment of not less than 5 years. . . .

4

and in relation to the crime of violence charged in Count 1, and during and in relation to the drug trafficking crimes charged in Counts 2 and 3, in violation of 18 U.S.C. §§ 924(c)(1) and 924(c)(2).[10]  In Counts 6, 7, 8, and 9, Cius, Gustama, Isnadin, and McKnight, respectively, were individually charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[11]

---

18 U.S.C. § 924(c)(1)(A)(i) (2006).

[9] Title 18 U.S.C. § 924(o) states that:

> A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life.

18 U.S.C. § 924(o) (2006).

[10] Title 18 U.S.C. § 924(c)(2) provides that "[f]or purposes of this subsection, the term 'drug trafficking crime' means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46."  18 U.S.C. § 924(c)(2) (2006).

[11] Title 18 U.S.C. § 922(g)(1) provides that:

> It shall be unlawful for any person…who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year…to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1) (2006).

Cius, Gustama, and Isnadin each pleaded not guilty to all counts and went to trial. McKnight entered a plea of guilty to Counts 1 and 5.[12]

At the close of the prosecution's case and at the close of all the evidence, the court denied the Appellants' motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.   The prosecutor and the Appellants' respective trial counsel discussed the entrapment defense during their closing arguments.  The prosecution objected to the Appellants' requested entrapment instruction but did not object to the court giving the jury the standard entrapment instruction.  See Eleventh Circuit Special Pattern Jury Instruction (Criminal Cases) 13.2 (2010). The district court gave the pattern instruction, explaining to counsel that it better stated the law.  In addition to providing the standard entrapment instruction, the district court also gave the pattern instruction regarding how to consider the different counts and the different defendants named in the indictment.  See Eleventh Circuit Basic Instruction (Criminal Cases) 10.4 (2010).

The jury found Cius guilty as to Count 2 of a lesser included offense involving 500 grams or more of cocaine; guilty as to Count 4; and not guilty as to Counts 1, 3, 5, and 6.  The jury found Gustama guilty as to Count 2 of a lesser included offense involving 500 grams or more of cocaine; guilty as to Count 4; and

---

[12] McKnight was sentenced to 24 months of imprisonment as to Count 1, and a consecutive 60 month term as to Count 5, for a total sentence of 84 months.

not guilty as to Counts 1, 3, 5, and 7.  The jury found Isnadin guilty as to Count 2 of a lesser included offense involving 500 grams or more of cocaine; guilty as to Counts 4, 5, and 8; and not guilty as to Counts 1 and 3.

Cius, Gustama, and Isnadin now raise several issues on appeal.  Before analyzing the merits of their arguments, it is necessary to outline in some detail the underlying facts leading to the Appellants' arrests, the district court's original instruction, and the district court's supplemental instruction regarding entrapment, which was given in response to the jury's question about whether entrapment as to one count should affect its verdict as to the other counts.

## B.    Government's Evidence at Trial[13]

The Government's evidence at trial tracked the ATF's undercover operation from the initial contact and meetings with Cius and Gustama through the day of the Appellants' arrests.

### 1.    The ATF's Undercover Operation

The Appellants' arrests on January 11, 2012 resulted from an undercover sting operation conducted by the ATF.  Special Agent Michael Connors testified as the Government's first witness.  He explained that the ATF uses sting operations to identify and apprehend individuals who are experienced in conducting home

---

[13] The Court, of course, considers the facts underlying the Appellants' convictions in the light most favorable to the United States.  See United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000).

invasion robberies.   In this case, Agent Connors posed as a disgruntled courier for a Mexican drug trafficking organization that was looking for an experienced crew to rob 15 to 20 kilograms of cocaine from a stash house in Broward County, Florida.

### a.    Initial Communication with Cius

Cius called Agent Connors on December 17, 2011, after a confidential informant provided him with Agent Connors' phone number.[14]  Agent Connors stated that he did not want to discuss anything over the phone and told Cius he would call him back the following week.

### b.    December 20, 2011 Meeting with Cius and Gustama

Agent Connors called Cius on December 20, 2011 and arranged to meet him later that afternoon in the parking lot of a Perkins restaurant off the Florida Turnpike.[15]  Agent Conners arrived first.  Shortly thereafter, Cius arrived, accompanied by Gustama.  Gustama was driving the car, and Cius was in the front

---

[14] The December 17, 2011 conversation was recorded and played for the jury, and the district court admitted the recording as Government Exhibit ("GX") 1A and the transcript as GX 1B.

[15] The December 20, 2011 conversation was recorded and played for the jury, and the district court admitted the recording as GX 2A and the transcript as GX 2B.

passenger seat. Agent Connors entered their car and sat in the rear passenger seat.[16]

Agent Connors told Cius and Gustama that he had a trucking company, and that once a month for the past year, he had worked as a courier for a Mexican drug trafficking organization, picking up "one or two bricks"[17] a month from various houses and transporting the bricks "up north." Agent Connors told them that 15 to 20 kilograms of cocaine were always in the house. He explained that he was usually the first courier to arrive at the house, and that after he picked up his two kilograms of cocaine, the remainder of the cocaine would still be there. Agent Connors told Cius and Gustama that he was upset because the drug traffickers had not paid him what they had promised, and he was "looking for, you know, a crew to knock them off." Agent Connors stated that he wanted five kilograms of cocaine as his share from the robbery. Agent Connors added that he had never seen money in the stash houses, "just coke." Cius asked Agent Connors to confirm the quantity of cocaine, and Agent Connors repeated, "15 to 20."

Gustama asked, "Where's it at though?" to which Agent Connors answered that the stash houses' locations changed from month to month. Agent Connors told them that the drug traffickers used different vacant houses with lock boxes on

---

[16] The conversation inside the car was recorded and played for the jury. The district court admitted the recording as GX 3A and the transcript as GX 3B.

[17] "Bricks" is a slang term for kilograms of cocaine.

the doors.   Agent Connors explained that although the location of the houses changed, the cocaine was always guarded by the same two men, Carlos and Richie. Agent Connors told Cius and Gustama that he usually received a phone call from the drug traffickers around 7:00 p.m. or 8:00 p.m. with the address of the house where he was to pick up the cocaine.   Gustama asked if anyone would be inside the house, and Agent Connors replied that Carlos and Richie would be inside, and warned that "they're always strapped," meaning that the guards were armed with guns.

Cius asked Agent Connors, "How can we get to the, um, them bricks?" Agent Connors replied that the bricks of cocaine were "just out there."   Cius asked whether the guards ever left the cocaine "at the house alone."   Agent Connors replied that the guards left the house only after all of the cocaine had been picked up by the other couriers.   Gustama asked whether the guards were "always strapped?"  Agent Connors replied: "Yeah.  The same two guys.  I don't know if this is something y'all can do or not or if it ain't, you know, just uh, you know, we never met and just leave it at that."   Cius replied, "I don't know. I don't know." Gustama explained: "We don't want to do that for nothing, you feel me. We don't want to do all that for nothing."   Agent Connors told Cius and Gustama that the drug traffickers "wouldn't call if the dope wasn't in there because the only reason they call me is to pick the [cocaine] up to put in my truck."   Gustama asked

10

whether they could "get the bricks without them knowing," and Agent Connors told him, "You got to [expletive deleted] rob them, bro" and "you got to tie me up or whatever." By saying this, Agent Connors wanted to make it clear that he was looking for a crew to conduct an armed robbery, because the purpose of the sting operation was to identify violent home invasion robbers. Agent Connors told them: "I ain't gonna shoot you all or whatever. But whatever they do is on them. I mean, if you don't know how to do this [expletive deleted] then, you know, take care of business the way you normally would. I don't care." Gustama replied, "I see what you're saying."

Agent Connors reiterated that the "bricks" were "always wrapped up tight" and that the two guards would be armed with "pistols." He said that they would not have to "go looking through the house" for the cocaine because "it's right there." Gustama asked, "Where's it at?" and Agent Connors replied, "It's always on the first floor." Cius and Gustama then asked about other ways to steal the cocaine ("We can't hit somebody he sell it to or something?" and "How about when it's coming in?"). Agent Connors explained that he had no idea where the cocaine would be located until he received the call with the address of the stash house:

> Connors:    So as soon as I get the address, you can all go ahead of me, take a look at it so you can, you know, check it out first or whatever. You go in behind me, I mean you got to, you know – if it's even something you can handle, you know.

11

Gustama:    Yeah, we'll do that.

Connors:    I mean, how many people you think you need to do that?

Cius:       About three people really.

Connors:    Just – just make sure if you do, just keep this tight, dog, you know. Don't be putting this out to everybody.

Cius:       No.

Connors:    You got to pick people that got the heart. Because you know like– you know like I do, man, when [expletive deleted] gets to flying, you know, you got to make sure you got the right people, you know. I ain't telling you how y'all do your business.

Cius:       We do this, man.

Agent Connors told Cius and Gustama that they could "talk about it" and get back to him "in like a week."  Agent Connors emphasized that he wanted to receive a share of five kilograms.   The December 20, 2012 meeting between Agent Connors, Cius and Gustama concluded this way:

Cius:       So you don't know when they're gonna call you?

Connors:    It will be a couple weeks. It's every, like three to four weeks. Once a month is basically what it works out to. So I just did one a week ago.

Cius:       I got your number though. I'm a save your number, you feel me.

Connors:    Yeah.

Cius:       I'm a give you a holler.

12

Connors:    You think you can handle it?

Cius:        Yeah.

Gustama:    Yeah.

Connors:    All right, man. Keep it tight. Like I said, it's a guaranteed thing.

By "guaranteed thing," Agent Connors was expressing his certainty that there would be 15 to 20 kilograms of cocaine in the house. At the end of the meeting, Cius repeated that he would give Agent Connors a call.

### c.    December 26, 2011 and December 28, 2011 Text Messages to Cius

On December 26, 2011, Agent Connors sent Cius a text message asking him if he was going to be able to handle the job they had talked about. Cius responded affirmatively and asked when it would occur. Agent Connors replied that it would probably be the following week and asked if he wanted to meet again "sometime this week." Cius responded: "OK let me knw wen u ready 2 meet up wit me!!"

On December 28, 2011, Agent Connors sent Cius a text message to set up a meeting that day in the same location where they had met before. Cius agreed to meet Agent Connors that afternoon, but later sent text messages to say he was running late. Agent Connors sent Cius a text message asking him if he was going to handle the job, and if not, to let him know so that he could find another crew to do the robbery. Agent Connors explained that his intent in sending Cius that

13

message was to give him an opportunity to back out of the plan.  Cius did not respond to that message.  The meeting planned for the afternoon of December 28, 2011 did not occur.

### d.    December 30, 2011 Text Message and Meeting With Cius and Gustama

On December 30, 2011, Cius sent Agent Connors a text message, with the greeting, "Wuz up bozzman?"  Agent Connors replied, "U tell me. U gonna get wit me on this?" and added that he was at the meeting "spot."   Cius replied that he was on his way.  Cius, Gustama, and Agent Connors met at the parking lot outside the Perkins restaurant near the Turnpike.[18]  At the beginning of the meeting, Cius told Agent Connors, "We've been waiting on you."  Agent Connors replied, "I just got the feeling, like, you didn't tell me last time whether you were going to be able to handle it."   Cius assured him: "We got the people. I got everything. We've been waiting on you."

Agent Connors told them that he expected the next delivery to be "in the next week."  Gustama asked where the stash house would be located, and Agent Connors told him that he would not know the address of the house until the night of the robbery.   Gustama confirmed with Agent Connors that there would only be "two people in the house," and Cius confirmed that "they're both going to be

---

[18] The conversation was recorded and played for the jury. The district court admitted the recording as GX 4A and the transcript as GX 4B.

14

downstairs."   Gustama asked Agent Connors if there would be anybody else "watching the house."   Agent Connors told them that the 15 to 20 kilograms of cocaine would already be "bricked up and wrapped up," and Gustama commented, "We gotta bring a bag."

Agent Connors reiterated that they had to make it appear that he was not involved: "You got to bust me up. I can't look like I was involved at all. Tie me up, just like leave it a little loose so I can get out."   Agent Connors warned again that he could not control how the two guards inside the house would respond.   Gustama asked Agent Connors what he knew about the guards' behavior and "moves," and Agent Connors replied that "usually everything is relaxed because they expect me."   Cius and Gustama told Agent Connors that they were ready:

Cius:        We ready, dog. We just waiting for the day, dog, you feel me.

Gustama:    Yeah, dog.

Connors:    I mean, you got the fire to take care of it?

Cius:        Yeah.

Gustama told Agent Connors that he wanted to know how many people were in the house before they went in, and Agent Connors proposed that they could wait outside, and he would send them a text message with the number of people inside. Agent Connors offered to rent a car for them to use as a getaway car, and he would

15

report it as stolen the next day.[19] Cius asked Agent Connors if he could "get him any cheap rental cars," and Agent Connors responded, "You're gonna have enough money you could buy as many cars as you want." Agent Connors asked how many people they thought they would need to commit the robbery, and Gustama replied, "[T]hree, four. Four the most, but three." Agent Connors said that he needed to pick up the cocaine within 15 or 20 minutes after he received the call with the address of the stash house or the guards would become "suspicious" and "paranoid." Cius assured Agent Connors, "We'll handle that though. We just – we ready for the day, dog [unintelligible], you feel me." Gustama also confirmed, "We ready when you ready. Put it like that."

Agent Connors reminded Cius and Gustama that he wanted to receive his share of five kilograms of the cocaine, and if there were more than 20 kilograms, "maybe we'll work something else out." Agent Connors warned them not to "put too much out right away, just in case," and Gustama assured him, "Yeah, yeah. We know how to handle that." Cius told Agent Connors: "Whenever you get the call, just let me know." Gustama added: "I'm ready, man. Totally ready, man." At the

---

[19] At trial, Agent Connors explained the reason for offering a rental car: "Based on our experience conducting these sting operations, we put that in place to safeguard the public because in our experience when these individuals come to show up for the last meeting, we have had instances where they have stolen a car and then arrived at the meeting in a stolen car. So we do that as an extra measure to protect the public. So we provide the rental car. And it also provides an opportunity for us to give a reason for them to come to the warehouse, to control the setting."

end of the meeting, Cius confirmed that he wanted Agent Connors to get the rental car for them.

### e.    January 4, 2012 and January 6, 2012 Text Messages

On January 4, 2012, Agent Connors sent Cius a text message letting him know that he had not yet received a phone call from the drug traffickers about when the cocaine would arrive. On January 6, 2012, Agent Connors sent Cius another text message telling him that he had "some new info," meaning that he had the date when the cocaine would arrive, and asking if they could meet at the same "spot." Cius did not reply until two days later, when on January 8, 2012, he sent Agent Connors a text message, telling him that he had been out of town, but that he could meet that day.

### f.    January 8, 2012 Meeting With Cius and Gustama

Cius, Gustama, and Agent Connors met on Sunday, January 8, 2012, at a gas station next to the parking lot of the Perkins restaurant.[20] Agent Connors told Cius and Gustama that the next delivery of cocaine would arrive Wednesday, January 11, 2012. They agreed to meet that day at 6:00 p.m. at the shop where Agent Connors kept his truck. The "shop" was actually an ATF undercover warehouse equipped with recording devices. Agent Connors told Cius and Gustama that he would have the rental car at the warehouse so that they would not have to use their

---

[20] The January 8, 2012 meeting was recorded and played for the jury. The district court admitted the recording as GX 5A and the transcript as GX 5B.

own car for the robbery.  Agent Connors said he would send a text message on Tuesday, January 10, 2012 to confirm the plan and provide directions on where to meet him.  On January 10, 2012, Agent Connors sent Cius a text message stating "all good for tomorrow" and making a plan to meet at 6:30 p.m. the following night.

### g.    January 11, 2012 Text Messages and Meeting With Cius, Gustama, Isnadin, and McKnight

On January 11, 2012, Cius sent Agent Connors a text message asking about the rental car.  Agent Connors responded that he would be picking up the rental car "in a few."  Cius asked Agent Connors if he could pick up the rental car "now" so that they could apply tint to the car windows.  Agent Connors replied that he could bring the tint with him to the warehouse, and that if they arrived by 6:30 p.m., they would have time to apply the tint to the windows before they received the call from the drug traffickers about the location of the stash house.  Cius agreed, but asked if Agent Connors would pick up the tint.  He also asked Agent Connors to make sure he rented a "fast car."  Agent Connors agreed.

Later, Cius sent Agent Connors a text message asking if he had picked up the rental car because he was ready to leave for the warehouse.  Cius again asked if it was a "fast car," and Agent Connors replied that it was.  Agent Connors directed Cius to meet him at a gas station.  Cius, accompanied by Isnadin and McKnight,

18

arrived at the gas station in a Dodge Charger driven by Gustama.  From the gas station, the four men followed Agent Connors to the warehouse.

When they arrived at the warehouse, Cius, Gustama, Isnadin, and McKnight got out of their car and followed Agent Connors inside the building to a conference room.  The four men were wearing dark clothing, and Gustama, Isnadin, and McKnight were also wearing gloves.  McKnight questioned Agent Connors about what the house would look like, which indicated to Agent Connors that the others had already briefed him on the plan.[21]  Because this was the first time that Agent Connors had met Isnadin and McKnight, he specifically reviewed the scenario with them.  Agent Connors warned them that "Carlos and Richie, two Mexican dudes," were "going to be strapped," meaning armed with handguns, and that the robbery had to appear like he was not involved.

Gustama reminded Agent Connors to send them a text message about how many people were inside the house.  Agent Connors asked whether everybody was going to enter the house, and Gustama responded, "We got that.  Don't worry about that. Just make sure the door open."  Gustama told Agent Connors that they would leave his share of the cocaine in the trunk of the rental car.  Agent Connors asked if they had "enough fire and [expletive deleted] to handle" the job, meaning

_____

[21] The January 11, 2012  meeting was recorded and played for the jury. The recording made from the audio recording device on Agent Connors' person was admitted as GX 6A, and the transcript of that recording was admitted as GX 6B. The recording made from the recording device inside the undercover location was admitted as GX 6C.

19

did they have guns.  Cius responded, "We got that, bro."  Isnadin said very little, but listened to everything that was being discussed.

Agent Connors offered to show them the rental car, a Nissan Altima, so that they could begin to tint the windows.  They all walked to the warehouse bay where the rental car was parked.   To put everybody at ease, Agent Connors asked the men if they wanted something to drink while they waited for the call and offered them beer and water.  While Agent Connors was out of the room to get the tint for the windows, Cius, Gustama, Isnadin, and McKnight high-fived and hugged each other.

The four men then applied the tint to the windows of the rental car.  Isnadin asked Agent Connors for some WD-40 oil to help with the application of the tint. Agent Connors left the bay and gave a pre-arranged signal to the members of the ATF Special Response Team, who were concealed in the warehouse area and poised to make the arrests.

### 2.    The Arrests

The arrest team entered and ordered everyone to get down on the ground. ATF Special Agent Cameron Conklin was a member of the arrest team that day. Agent Conklin testified that as he approached the Appellants to arrest them, he observed Isnadin pull a .357 revolver from the waistband of his pants and slide it under the rental car.  ATF agents later recovered that .357 revolver, and four

20

rounds of .357 ammunition, from beneath the rental car.  ATF agents also recovered two more guns from beneath the rental car.  One was a Glock 9 mm pistol, loaded with 14 rounds of ammunition and located near where Gustama was lying on the ground.  The other was a .40 caliber Taurus pistol, loaded with nine rounds of ammunition and in close proximity to where McKnight was lying on the ground.   The parties stipulated that Cius, Gustama, and Isnadin had been convicted previously of felony offenses.

## C.    Defendants-Appellants' Evidence at Trial

Cius called ATF Special Agent Pamela Bradley, the case agent, who testified that agents "did not recover a firearm that was attributed to Mr. Cius.  He told the undercover on multiple occasions that he had the firearm."  Agent Bradley further stated that "a firearm was not recovered from Mr. Cius at the warehouse that night."  Neither Gustama nor Isnadin presented a case in chief.

## D.    The Jury Instructions

Before addressing the Appellants' challenges on appeal, it is helpful to review the district court's original entrapment charge and the response provided by the district court to the jury's question regarding entrapment.  Both are addressed below.

### 1.    The Original Charge Related to Entrapment

During the charge conference, the Appellants requested a particular jury instruction on entrapment drafted by Cius's counsel.[22] The Government objected to the proposed instruction, but did not object to the court giving the standard pattern entrapment instruction. The district court agreed with the prosecution that the "standard instruction better sets forth the law on entrapment." Thus, as part of its final instruction to the jury, the district court stated:

> "Entrapment" occurs when law enforcement officers or others under their direction persuade a defendant to commit a crime the defendant had no previous intent to commit.
>
> The defendant has claimed to be a victim of entrapment regarding the charged offense.
>
> The law forbids convicting an entrapped defendant.
>
> But there is no entrapment when a defendant is willing to break the law and the Government merely provides what appears to be a favorable opportunity for the defendant to commit a crime.
>
> For example, it is not entrapment for a Government agent to pretend to be someone else and offer – directly or through another person – to engage in an unlawful transaction.
>
> You must not evaluate the conduct of Government officers or others under their direction to decide whether you approve of the conduct or think it was moral. So, a defendant isn't a victim of entrapment if you find beyond a reasonable doubt that the defendant [sic] only offered the defendant an opportunity to commit a crime the defendant was already willing to commit.

---

[22] The proposed instruction consists of seven alternative entrapment instructions. That proposed instruction did not specifically address the key issue in this appeal ─ whether Appellants' entrapment defense should be applied on an offense by offense basis.

22

But if there is a reasonable doubt about whether the defendant was willing to commit the crime without the persuasion of a Government officer or a person under the Government's direction, you must find the defendant not guilty.[23]

The district court further instructed the jury:

Each count of the Indictment charges a separate crime against one or more of the defendants. You must consider each crime and the evidence relating to it separately. And you must consider the case of each defendant separately and individually. If you find a defendant guilty of one crime, that must not affect your verdict for any other crime or any other defendant.[24]

None of the Appellants objected to this instruction when it was proposed at the charge conference; in addition, after the instructions were read to the jury, they did not object to the "content or the manner in which the court gave the instructions."

### 2.    Supplemental Instruction Related to Entrapment

During deliberations, the court informed the parties that it had received the following question from the jury: "Count 1 – How does entrapment the other accounts? [sic] If we believe in entrapment, are the other charges applicable: count 2, count 3?"[25]  The Government argued that the jury should be told that "each count would be subject to entrapment individually."  The district court then stated:

---

[23] Eleventh Circuit Special Pattern Instruction (Criminal Cases) 13.2 (2010).

[24] Eleventh Circuit Pattern Instruction (Criminal Cases) 10.4 (2010).

[25] The jury also asked a second question regarding how to attribute the amount of cocaine to each Defendant-Appellant.  That question has no bearing on the instant appeal.

THE COURT: I agree. I didn't mean to say that if you find entrapment as to one count, you have to find entrapment as to all six. I don't think that's the case. I think the jury has to consider each count and each defendant separately and distinctly. They could come back with some entrapment findings or they could come back with some that weren't entrapped. So it would seem to me that I should tell them -- even though they are not asking it -- that entrapment is raised as a defense as to each defendant as to each of the six counts and that they are to view the evidence separately and distinctly as it relates to each defendant and each count. And they could come back with all guilties, all not guilties, some guilties, some not guilties.

Cius's counsel objected, and requested a different response:

MR. ROBBINS: It's my belief that if they believe that there is entrapment as to one count, then there should be entrapment for all the counts, and that would be my request to answer these questions.

Cius's counsel argued that "my analogy is like -- it's like the fruit of the poisonous tree. I mean, you know, if what was done was improper, then everything that flows therefrom should be improper." After some colloquy, the following exchange occurred:

MR. ROBBINS: Your Honor, after conferring with our clients, we would ask that Your Honor instruct the jury that the entrapment applies to all the counts. It's an either all or nothing situation.

THE COURT: I don't think that's correct. What do you think, Mr. Tantillo?

MR. TANTILLO [the AUSA]: Your Honor, I agree with you. It's not correct. It applies to each individual count in this particular matter. A person can be predisposed and have intent to commit one crime, but not another. And I think, as you stated very correctly and as was outlined in the conversation I think on the 20th of December, Mr. Gustama may have very well wanted to steal the cocaine, but not have wanted to rob it.

24

The following discussion then ensued:

> [The Court]:  All right. As to the first question, I would propose telling the jury: All three defendants have raised entrapment as a defense to each of the six charges against each of them.  You are to consider the evidence separately and distinctly as to each defendant and as to each count. Therefore, if you find that the Government has not proved beyond a reasonable doubt that a particular defendant as to a particular count was not entrapped, you should find that defendant not guilty as to that particular count. Then you would consider the other 17 counts.
>
> MR. TANTILLO:  Individually or separately?
>
> THE COURT: Then you would consider the other 17 counts individually and separately.
>
> MR. TANTILLO: Thank you, Your Honor.
>
> THE COURT: Any comments or objections to that proposed way to answer the first question?
>
> MR. ROBBINS: I mean with all due respect to the Court, you know, I mean I rather that instruction not go in because I am still of the belief if it's entrapment as to one, it should be  entrapment  to all.  And  maybe  Your  Honor  should answer the question that --
>
> THE COURT: I can't tell them entrapment as to one count is entrapment as to all 18. I mean the situations are different. Mr. Isnadin only showed up the last day of the situation. They may find that he wasn't entrapped the last day and that the other two, Mr. Cius and Mr. Gustama, were entrapped. So I can't tell them: If you find entrapment, then you got to find everybody not guilty. And the jury may find, for example, Mr. Isnadin was never told anything by any Government agent before he showed up – if the jury wants to believe it – with a gun. So, you know, how was he entrapped about bringing a gun if he is a convicted felon? So I am not going to tell the jury that if they find that what Mr. Cius and Mr. Gustama were told in December

25

constituted entrapment, that that somehow is the fruit of the poisonous tree so that Mr. Isnadin can show up with a gun when he has never had any contact with a law enforcement officer or other agent and all of a sudden he gets immunity for that action. I am not going to tell them that.

MR. ROBBINS: But my position is that, you know, if they find entrapment for one count, then they should find it for all counts, not to – they still can divide the defendants up, you know, and still decide which defendant has the benefit of the entrapment defense.

THE COURT: Then what you are suggesting is I tell them: If you find a particular defendant was entrapped, your verdict should be not guilty as to all six counts.

MR. ROBBINS: Yes.

THE COURT: And if you find that the defendant was not entrapped, if you find the Government proved beyond a reasonable doubt that they weren't entrapped and they otherwise proved all of the elements of the crime, then you should find them guilty on all six counts.

MR. ROBBINS: Yes.

THE COURT: I don't think that's the law. I think you can get entrapped as to committing one crime, but not as to others.

MR. ROBBINS: I don't see how –

THE COURT: I don't think entrapment applies to the transaction. I think it applies to the crime.

MR. ROBBINS: I just don't see how you can take – I mean, all these cases – all these different charges were all intertwined. It was all, you know, the robbery and the cocaine and the guns. It was all one – basically one sales job by the agent. And he was – and when he was talking to the defendants, he was talking about the cocaine, he was talking about the robbery, he was talking about the weapons. And I don't think that there should be a differentiation between those – you know, I mean it was all one – like one transaction. It was all one issue.

26

It wasn't like it was divided – when the officers talk about it, it was the –

THE COURT: And the jury may very well find factually that that's the case, but I don't think they have to. I think the jury could find that, you know, these guys brought guns and that they were comfortable bringing guns and they were predisposed to do it and find them guilty of possession of a firearm by a convicted felon. Under your scenario that would be precluded.

Gustama's counsel then proposed an alternative instruction:

MR. HOROWITZ: Your Honor, while I join in Mr. Robbins' request for the all or nothing instruction, for lack of a better term, if the Court was to deny that request, a simple answer to the question would be entrapment is a defense as to all counts of the Indictment as to all defendants, and then let the jury deliberate. I think that says it in a – giving them an opportunity to find entrapment or not find entrapment as to all counts.

The district court rejected this proposal as well, and stated: "All right. I think I am going to give the instruction the way I proposed it over all three defendants' objections. . . . So I am going to give the instructions the way I proposed them and the defense objections are overruled." The district court then answered the jury's question:

THE COURT: All right. We have two notes from you or two questions from you.

Count 1. How does entrapment affect the other counts? If we believe in entrapment, are the other charges applicable to count 2, count 3?

All three defendants have raised entrapment as [a] defense as to each of the six charges against each of them. You are to consider the evidence separately and distinctly as to each defendant and as to each count. Therefore, if you find that the Government has not proved

27

beyond a reasonable doubt that a particular defendant as to a particular count was not entrapped, you should find that defendant not guilty as to that particular count. Then you would consider the other 17 counts individually and separately.

## II.  ISSUES ON APPEAL

We must address three separate issues on appeal.  First, as to Cius and Gustama, we must decide whether the district court's supplemental instruction directing the jury to consider the entrapment defense individually and separately as to each count was in error.  Second, we must determine whether sufficient evidence supports the convictions.  In so doing, we analyze whether there was sufficient evidence of predisposition to convict Cius and Gustama of Counts 2 and 4.  We also examine whether the district court erred in denying Gustama's motions for judgment of acquittal.  Third, we must determine whether Isnadin's derivative entrapment argument has merit.  We consider each of these issues in turn.

## III.  DISCUSSION

A.    **The Supplemental Instruction Regarding Entrapment**

We begin our discussion by addressing the Appellants' challenges to the district court's supplemental instruction regarding entrapment.  This analysis requires us to address the standard of review, the law of entrapment, and the Appellants' arguments regarding how a "course of conduct" affects the question of entrapment.

1.    **Standard of Review**

28

We review the legal correctness of a jury instruction de novo.  United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000) (citations omitted).  However, questions of phrasing, including a district court's response to a jury question, are reviewed for an abuse of discretion.  United States v. Lopez, 590 F.3d 1238, 1247 (11th Cir. 2009).  District courts enjoy broad discretion in formulating jury instructions, so long as the charge as a whole accurately reflects the law in the context of a case's facts.  Id. at 1247-48.  "A challenged supplemental jury instruction is reviewed as part of the entire jury charge, in light of the indictment, evidence presented and argument of counsel to determine whether the jury was misled and whether the jury understood the issues."  Id. at 1248 (internal citations and quotations omitted).  We will not reverse a conviction on the basis of a jury charge unless "the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process."  Prather, 205 F.3d at 1270 (internal citations and quotations omitted).  Of course, where a party did not object to a jury instruction in the district court, we review that instruction for plain error.  Id. (citing Fed. R. Crim. P. 30, 52(b)).

### 2.    The District Court Did Not Abuse its Discretion by Instructing the Jury to Consider Entrapment on a Count by Count Basis

At the outset, it is important to note what is not at issue on this appeal.  As part of its initial instructions, the district court instructed the jury that it should consider each crime and each defendant separately, noting in pertinent part: "[I]f

29

you find a Defendant guilty of one crime, that must not affect your verdict for any other crime or any other Defendant." This language tracked Eleventh Circuit Pattern Jury Instruction (Criminal Cases) § 10.4 (2010). Cius and Gustama concede they did not object to this instruction when it was given. According to the annotation for this pattern instruction, however, this language should be removed when an indictment is structured so that a conviction of one count or counts (i.e., "predicate offenses") is necessary to a conviction of another count or counts. Cius and Gustama were both charged with two § 924(c) offenses in Counts 4 and 5. An essential element of both these offenses is the commission of one of the predicate offenses charged in Counts 1, 2, or 3.[26] Because no objection was made to Pattern Instruction 10.4 at the time it was given, if we were to review this instruction, we would do so for plain error. And, in that event, we would find no error with the instruction. However, as Cius and Gustama have readily agreed (in both their briefs and at oral argument), the issue here is the supplemental instruction given in response to the entrapment question—not the initial instruction on considering

---

[26] Indeed, the district court instructed the jury as much in the initial instructions. Regarding Counts 4 and 5, the district court instructed the jury that in order to convict, "the evidence must show beyond a reasonable doubt…[t]hat the object of the unlawful plan was to use or carry a firearm during and in relation to one of the federal drug trafficking crimes, or the federal crime of violence, or both, as charged in Counts 1, 2, and 3 of the indictment."

each count and each defendant separately.[27]  Further, neither Cius nor Gustama

challenge the original pattern entrapment instruction.  Therefore, we turn to the

question of whether the district court abused its discretion when it answered the

jury's question and instructed it to consider the defense of entrapment separately

and individually as to each defendant and each count charged in the indictment.

We find that it did not.

### a.    The Law of Entrapment

The entrapment defense involves two separate elements: (1) Government

inducement of the crime, and (2) lack of predisposition on the part of the

defendant.  United States v. Mathews, 485 U.S. 58, 63 (1988); United States v.

Costales, 5 F.3d 480, 487 (11th Cir. 1993) (emphasis added).  The defendant bears

an initial burden of production to show that the first element, Government

inducement, is met. United States v. Ventura, 936 F.2d 1228, 1230 (11th Cir.

1991) (emphasis added).  Once the defendant makes this initial showing, the

burden shifts to the Government to prove beyond a reasonable doubt that the

defendant was predisposed to commit the crime.  Id.; see also United States v.

Brown, 43 F.3d 618, 623 (11th Cir. 1995).

---

[27] Cius, and Gustama by adoption, state that "what is at issue is the error in the trial court's supplemental jury instruction."  (Reply Brief at 10).  Furthermore, at oral argument, Cius's counsel admitted, that even if not in the context of this case, the instruction was an accurate statement of the law, to which the Appellants did not object.

To show Government inducement, a defendant may produce any evidence sufficient to raise a jury issue "that the [G]overnment's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." United States v. Andrews, 765 F.2d 1491, 1499 (11th Cir. 1985) (quoting United States v. Dickens, 524 F.2d 441, 444 (5th Cir. 1975)). Again, this is merely a burden of production. A defendant has no burden of proof at any point during a criminal trial. See In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). Moreover, "[t]his burden [of production] is light because a defendant is generally entitled to put a recognized defense to the jury where sufficient evidence exists for a reasonable jury to find in [his] favor." Brown, 43 F.3d at 623 (citing Matthews, 485 U.S. at 63).

The "predisposition inquiry is a purely subjective one which asks the jury to consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the [G]overnment's officers or agents." Id. at 624. This element "focuses upon whether the defendant was an 'unwary innocent' or, instead an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." Matthews, 485 U.S. at 63. This Court has rejected the notion that the predisposition analysis is one that occurs against a backdrop of fixed, enumerated

32

factors; instead, it has held that it is necessarily a fact-intensive, subjective inquiry

into a defendant's state of mind.  See Brown, 43 F.3d at 625. However, as we

explained in Brown, several general principles guide the exercise:

> The Government need not produce evidence of predisposition prior to
> its investigation. Aibejeris, 28 F.3d at 99.  Predisposition may be
> demonstrated simply by a defendant's ready commission of the
> charged crime. Jacobson, 503 U.S. at [550], 112 S.Ct. at 1541;
> Andrews, 765 F.2d at 1499. A predisposition finding is also supported
> by evidence that the defendant was given opportunities to back out of
> illegal transactions but failed to do so. Ventura, 936 F.2d at 1231,
> 1232. Post-crime statements will support a jury's rejection of an
> entrapment defense. Andrews, 765 F.2d at 1499.  Existence of prior
> related offenses is relevant, but not dispositive. Id. at 1500.  Evidence
> of legal activity combined with evidence of certain non-criminal
> tendencies, standing alone, cannot support a conviction. See Jacobson,
> 503 U.S. at [550], 112 S.Ct. at 1543.  Finally, the fact-intensive nature
> of the entrapment defense often makes jury consideration of demeanor
> and credibility evidence a pivotal factor. See Ventura, 936 F.2d at
> 1230.

Id.

### b.    The "Course of Conduct" Theory Advanced by Cius and Gustama Regarding the Supplemental Instruction is One of First Impression in this Circuit

Cius and Gustama contend that the district court erred when it instructed the

jury to consider entrapment separately as to each count, and that the district court's

supplemental instruction misconstrued legal principles set forth in a former Fifth

Circuit opinion, <u>United States v. Wells</u>, 506 F.2d 924 (5th Cir. 1975).[28]  They

maintain that Agent Connors presented a single "scenario" premised a scheme to

rob the cocaine from two armed guards at the stash house.   In other words, Cius

and Gustama contend that, but for the opportunity to rob the stash house, there

could be no agreement to possess the cocaine or to use or carry a firearm.  Thus,

they argue, the crimes charged in the Indictment were a course of conduct such that

if they were entrapped as to committing the first crime, they necessarily were

entrapped as to committing the separate offenses charged in the remaining counts.

For this reason, they assert that the district court should have instructed the jury

that if it found entrapment as to Count 1 it necessarily must have found entrapment

as to the remaining counts.  This Circuit has not previously addressed this specific

question, but we decide it today.  In doing so, we conclude that the position

championed by Cius and Gustama incorrectly states the law as to entrapment, a

defense that again has two separate, albeit related, elements.  Our analysis of the

argument and our explanation as to why the district court did not commit error in

giving the supplemental jury instruction follows.

> ### c.    The Former Fifth Circuit's Decision in <u>United States v. Wells</u>

---

[28] The holdings in decisions rendered by the former Fifth Circuit prior to October 1, 1981 are binding on this Circuit.  <u>Bonner v. City of Pritchard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

The first argument that we must address is the contention by Cius and Gustama that this case involves a single course of conduct and the former Fifth Circuit's decision in Wells requires us to find the supplemental instruction was given in error. We disagree, concluding that Cius and Gustama's reliance on the Wells decision is misplaced.

In Wells, the defendant argued on appeal that the district court should have instructed a jury that it could find that the series of underlying drug sales was a "course of conduct" induced by the activity of the Government. Wells, 506 F.2d at 926. Wells had been indicted on eight counts of possession with intent to distribute and distribution of a controlled substance. Id. at 924. The jury found Wells not guilty as to the first transaction (charged in the first two counts), but guilty as to the last three transactions (charged in the subsequent counts). As in this case, the trial court in Wells addressed entrapment in its initial instruction and there was no objection to that instruction. The Wells trial court also gave a supplemental instruction after the jury asked a question during its deliberations. The specific question posed by the jury in Wells was this:

> If we find the defendant was entrapped, is he therefore not guilty on all counts or can we find that he was initially entrapped on Counts 1 and 2 and guilty on the remainder counts?

Id. at 925. After soliciting input from trial counsel, the trial court gave the jury this supplemental instruction:

> You must determine whether or not the defense of entrapment is applicable to any or all counts. Each count must be considered separately. Your verdicts may be the same or they may be different. Each verdict must be agreed to by all members of the jury.

Id. Wells argued on appeal that the jury should have been instructed on "course of conduct" based upon the Supreme Court's decision in Sherman v. United States, 356 U.S. 369 (1958). Id. The former Fifth Circuit disagreed and affirmed. Before we address the application of Wells here, we first analyze the Supreme Court's decision in Sherman.

In Sherman, the Supreme Court reversed a conviction for three narcotics sales, finding that the evidence at trial established entrapment as a matter of law. A Government informant met with Sherman while the two were undergoing treatment for narcotics addiction. Sherman initially refused the Government agent's request to supply him with narcotics. But, after several additional pleas, Sherman agreed. Through this process, Sherman was re-addicted. After the informant notified Government agents that Sherman was a seller, they observed three additional transactions, for which Sherman was convicted. In finding that Sherman was entrapped, the Court stated, in dicta, "[I]t makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement." Sherman, 356 U.S. at 374

36

(emphasis added).[29]  The Supreme Court then proceeded to analyze the predisposition element of entrapment.  The Supreme Court ultimately concluded the Government's evidence was insufficient on this point.  However, notably the Court's analysis did not screech to a halt upon the mere suggestion that the drug charges formed part of the same course of conduct that was the product of Government inducement.  Rather, the Supreme Court carefully parsed the Government's evidence on predisposition and explained why it was insufficient to overcome the entrapment defense.

This analysis of Sherman informs our review of the former Fifth Circuit's decision in Wells.  As part of its analysis, the Wells court first explained precisely what Sherman suggested regarding a "course of conduct," and noted that this moniker was merely part of the Supreme Court's comment, in passing, "on the argument that if there was inducement, it produced acts which occurred prior to those for which Sherman was convicted."  Wells, 506 F.2d at 926 (emphasis added).  The Wells court further distinguished the facts before it from those in Sherman by observing that no prior sales were at issue and that the "[G]overnment's inducement allegedly produced only those acts for which Wells was tried."  Id.  (emphasis added).  The court concluded that because it was instructed to consider entrapment separately as to each count, the jury was free to

---

[29] There was no issue in Sherman concerning jury instructions.

find that the series of drug sales were a "course of conduct" <u>induced</u> by the Government. On this basis, the <u>Wells</u> court concluded that the trial court committed no error in giving the jury the challenged supplemental instruction. In reaching this conclusion, the court noted that "[u]nless the evidence established as a matter of law that there was a 'course of conduct,' it would have been error to charge, as the defense requested at trial, that Wells was either guilty of all or innocent of all." <u>Id</u>.

Cius and Gustama, seizing upon this language in <u>Wells</u>, contend that when determining whether an entrapment defense applies across the board to all counts, or to each count separately and individually, a district court must determine whether the counts are part of a single "course of conduct," or, on the other hand, are "wholly separate." However, Cius and Gustama ask us to extend <u>Wells</u> too far. First, we are not bound by the proposition for which Cius and Gustama cite <u>Wells</u>, as it was not essential to the holding, and thus is non-binding <u>dictum</u>. Second, we note that Cius and Gustama's argument ignores the tautological point that the former Fifth Circuit concluded in <u>Wells</u> that the district court did not commit error by instructing the jury that it should consider entrapment as to each count. <u>Wells</u>, 506 F.2d at 926. The <u>Wells</u> decision simply does not stand for the proposition that Cius and Gustama assert: that when a so-called "course of conduct" exists, it is necessary to give an all or nothing entrapment defense instruction.

### d.    The Question of "Course of Conduct" and Continuing Entrapment

Contrary to their argument, whether the charges against Cius and Gustama formed part of the same course of conduct is not determinative of when an entrapment defense applies to all counts or must be assessed separately by the trier of fact as to each count.  See, e.g., United States v. Mitchell, 67 F.3d 1248 (6th Cir. 1995) (rejecting a continuing entrapment instruction, and concluding that even though the drug sales at issue were only days apart, they did not form part of the same course of conduct that was the product of the original inducement, and finding that the district court's instruction to consider entrapment separately was not in error because the jury could have found particular evidence on record as indicative of predisposition unrelated to the first "induced" sale);  United States v. Khubani, 791 F.2d 260, 264 (2d Cir. 1986) ("Limiting examination of defendant's state of mind to the period prior to any [G]overnmental contact ignores the possibility that the defendant could become predisposed to commit the crime after the [G]overnment's first contact."); United States v. North, 746 F.2d 627, 630 (9th Cir. 1984) ("The initial entrapment, assuming it existed, did not immunize [the defendant] from criminal liability for subsequent transactions that he readily and willingly undertook.  Whether any initial entrapment extended through some or all of the later transactions was a question of fact that the [trial court's] instruction properly left to the jury."), abrogated on other grounds, United States v. Kent, 649

F.3d 907 (9th Cir. 2011)); see also United States v. Curry, 284 F. Supp. 458, 464

(N.D. Ill. 1968) (after finding that various drug sales were part of a continuous

relationship between the defendants and the Government agent and that both sales

were induced by the same course of conduct, analyzing "the remaining entrapment

issue" as to whether the defendants were sufficiently predisposed).[30]

---

[30] Of course, this is not to say it is never appropriate for a district court to provide a continuing entrapment instruction. In fact, this is exactly what occurred in United States v. Slaughter, 891 F.2d 691 (9th Cir. 1989) and United States v. Beal, 961 F.2d 1512 (10th Cir. 1992). However, those two cases are readily distinguishable.

In Slaughter, the defendant was indicted on three counts of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1). The defendant appealed his conviction on two of the three counts arguing that the district court should have instructed the jury that it could find the defendant was entrapped in the first instance and therefore all criminal acts following were subject to the initial entrapment. The Ninth Circuit found that the district court erred in failing to give this instruction "given the short period between the three drug transactions [five days] and the obvious jury confusion on the issue of entrapment." Slaughter, 891 F.2d at 700. Although the court found the district court had erred under the circumstances of that particular case, it did not conclude that the continuing entrapment instruction should be given in every multiple count, "course of conduct" case. Id.

In Beal, the Government appealed from an order granting the defendant's motion for judgment of acquittal. Beal, 961 F.2d at 1513. The defendant was indicted on two counts of selling a controlled substance to an undercover police officer. Id. Relying on Sherman, the Tenth Circuit found that the district court's conclusion that the defendant was entrapped as matter of law on each count was correct because the "two counts were founded upon one continuous course of conduct" and therefore it followed that the original inducement which "beguiled" the defendant carried over to the second charge. Id. at 1517 (emphasis added). The court explicitly found that it would not hold as a general rule that once entrapment occurred, a defendant's subsequent acts are immunized from culpability. The court concluded that under the facts of that case only "the original inducement and not the defendant's predisposition provided motive for his otherwise criminal acts." Id. at 1517.

Although a finding of continuing entrapment was appropriate in these cases, we find that the underlying crimes in Slaughter and Beal were noticeably different from the charges here. The charges forming the basis of the indictment in those two cases were the same crime—that is, counts alleging violations of the same criminal statute. Here, the charges do not relate to the same crime. Rather, they related to wholly distinct allegations asserting violations of different criminal statutes. Each charge in the Indictment alleged a separate offense, unlike the situations in Slaughter and Beal. In some instances it may be proper to provide a continuing entrapment instruction on facts such as those found in Slaughter and Beal, (i.e., where the defendants were

For purposes of this decision, we need not decide whether the separate counts on which Cius and Gustama were indicted formed part of the same course of conduct. Even if we assume there was such a course of conduct, that finding is only helpful to Cius and Gustama to the extent it serves as a basis for the conclusion that they carried their initial burden of production to show inducement as to each count. We note of course, that Appellants could have met this initial burden of production by showing Government inducement as to each of the charges they faced. By successfully carrying that burden of production, the Appellants were able to place squarely before the jury the issue of entrapment as to each offense charged.[31]

A review of this record amply demonstrates that the district court necessarily determined Cius and Gustama met their burden of production regarding inducement. The district court gave an entrapment instruction and told the jury to consider the issue as to each count. It is immaterial for purposes of our analysis whether the district court did so based upon a finding that there was a course of

charged in a series of drug transactions and accused of violating the same criminal statute, and the evidence regarding the defendant's predisposition to commit the crime is the same for each count). That is not the case here, and it was appropriate for the district court to instruct the jury to consider entrapment separately as to each count, which charged each defendant with separate crimes.

[31] Moreover, whether the Government induced Cius and Gustama into a course of conduct does not answer the question about whether either man was predisposed to commit the crimes that formed part of that course of conduct absent the inducement.

41

conduct or, alternatively, because it analyzed the inducement evidence as to each count separately. In either event, the trial court correctly shifted the burden to the Government to prove beyond a reasonable doubt that Cius and Gustama were predisposed to commit the crimes for which they were charged—not whether they were predisposed to commit a "course of conduct."

To put it a slightly different way, even if the counts charged in the Indictment formed part of the same course of conduct, and even if Cius and Gustama were induced as to all counts, there is still the question of whether they were predisposed to commit each of the crimes at issue. Because of the subjective, fact-intensive nature of the predisposition inquiry, it may well be that the facts of a given case indicate that an individual defendant is predisposed to commit some crimes, but not others. And, to be clear, the key inquiry for us is whether the evidence in the light most favorable to the Government shows that Cius and Gustama were predisposed to commit the offenses of conviction. For example, it is possible Cius and Gustama were predisposed to conspire to possess the cocaine in some manner (as charged in Count 2), even if they were not predisposed to "rob them 'bro'" (as charged in Count 1). In fact, as discussed below, a review of the record demonstrates that the evidence supports that very conclusion. Accordingly, as part of our review, we must consider whether the evidence adduced at trial

42

supports a finding by the jury that Cius and Gustama were predisposed to commit the offenses charged in Counts 2 and 4.

## B.    Sufficiency of the Evidence

We now turn to the question of whether there is sufficient evidence regarding predisposition to support the jury's verdicts against Cius and Gustama. We are also called upon to address Gustama's other challenges to the sufficiency of the evidence and his separate contention that he was entrapped as a matter of law.

### 1.    Standard of Review

This Court reviews de novo whether there is sufficient evidence to support a guilty verdict in a criminal trial. United States v. Doe, 661 F.3d 550, 560 (11th Cir. 2011), cert. denied, 132 S. Ct. 1648 (2012). In so doing, the Court views the evidence in the light most favorable to the Government and resolves all reasonable inferences and credibility evaluations in favor of the verdict. Id. "Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009) (internal quotations and citations omitted). If a reasonable trier of fact could so find, "[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." United States v. Robertson, 493 F.3d 1322, 1329

43

(11th Cir. 2007) (internal quotations and citations omitted).   "[A]ll reasonable inferences must be drawn in favor of supporting the jury's verdict." United States v. Sawyer, 799 F.2d 1494, 1501 (11th Cir. 1986) (per curiam) (citing Glasser v. United States, 315 U.S. 60, 80 (1942)).

"The test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence." United States v. Mieres-Borges, 919 F.2d 652, 656-57 (11th Cir. 1990) (internal quotation marks omitted). However, "[w]here the [G]overnment relies on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict." United States v. Klopf, 423 F.3d 1228, 1236 (11th Cir. 2005) (internal quotation marks omitted).

This Court has observed that "[e]ntrapment is generally a jury question," and "[t]herefore, entrapment as a matter of law is a sufficiency of the evidence inquiry." Brown, 43 F.3d at 622 (11th Cir. 1995). Thus, in assessing an entrapment as a matter of law argument, we ask whether the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to commit the offense at issue. United States v. King, 73 F.3d 1564, 1568 (11th Cir. 1996). "When an entrapment defense is rejected by [a] jury, our review is limited to deciding whether the evidence was sufficient for a reasonable jury to conclude

44

that the defendant was predisposed to take part in the illicit transaction." Brown, 43 F.3d at 622 (citing United States v. Aiberjeris, 28 F.3d 97, 99 (11th Cir. 1994)).

## 2.    Analysis

As a preliminary matter, we note that in making their entrapment argument, Cius and Gustama invite us to make a substantial leap in logic. That is, they ask us to assume, based upon the jury's question regarding entrapment and its subsequent verdict as to Count 1, that the jury necessarily determined that Cius and Gustama were found not guilty because they were entrapped. There are at least two flaws in this argument. First, there is no way for us to tell—and, indeed, no way to know—if the jury's verdict as to Count 1 was occasioned by a conclusion that Cius and Gustama were entrapped. On this record, it is impossible for us to determine precisely why the jury acquitted Cius and Gustama on Count 1. For example, it could be that the jury determined that the Government failed to present sufficient evidence—that is, evidence beyond a reasonable doubt—as to one or more of the essential elements needed to convict on the Hobbs Act conspiracy charge. In that event, the jury would not have been required to consider the issue of entrapment as to Count 1. On the other hand, it is possible that the jury found sufficient evidence to convict but determined Cius and Gustama were entrapped (i.e., that they were not predisposed to scheme to commit a robbery). In any event, without the benefit of special interrogatories or any other evidence on record, we simply cannot say

for sure.  But we are sure of at least this much:  the evidence was sufficient to establish not only that Cius and Gustama committed the crimes charged in Counts 2 and 4, but also that they were predisposed to commit such crimes.

In addition to the arguments he adopts regarding the supplemental instruction on entrapment, Gustama also maintains that the district court erred in denying his motions for judgment of acquittal because (1) the evidence was insufficient to convict him on Counts 2 and 4, and (2) he was entrapped as a matter of law.  We disagree and address these arguments along with the questions of predisposition and sufficiency of the evidence.

Construed in the light most favorable to the Government, a review of the evidence outlined below demonstrates that a reasonable trier of fact could conclude that Cius and Gustama were predisposed to commit the crimes charged in Counts 2 and 4, and therefore were not entrapped as to those charges.

### a.    Predisposition of Cius and Gustama to Conspire to Possess a Controlled Substance with the Intent to Distribute It (Count 2)

During their initial meeting with Agent Connors, Gustama asked in Cius's presence how they could get to the cocaine without the armed guards knowing.  Later, during this same meeting, the following conversation ensued:

> Cius:       So the only way to get is to be at the house?
>
> Connors:    That's it.

46

Cius:        So we cannot – we can't hit someone he sell it to or something?

Connors:    Mm-mm.  You ain't gonna get nothing.  You'll get one or two.

Gustama:    How about when it's coming in?

Connors:    I have no idea. . . .

From this evidence, a reasonable jury could conclude that Cius and Gustama schemed to possess the cocaine stored at the stash house, even if they were not predisposed to rob the armed guards to obtain it.  Again, predisposition is a fact-intensive, subjective inquiry, and it was certainly permissible for the jury to conclude that Appellants conspired to secure the drugs in their possession by some means, even if not by armed robbery.

### b.    Predisposition of Cius and Gustama to Conspire to Possess a Weapon in Furtherance of a Drug Trafficking Crime (Count 4)

Turning next to the question of whether Cius and Gustama were entrapped as to the charge in Count 4, the evidence supports the jury's verdict that they both were predisposed to conspire to carry or use weapons in obtaining the cocaine (as charged in Count 4), even assuming they were not predisposed to agree to rob the cocaine by force, violence, or fear of injury (as charged in Count 1).  Importantly, in this case Count 4 charged the weapons conspiracy offense in the alternative.  That is, the Government charged that Cius and Gustama either conspired to possess

47

a weapon in furtherance of their plan to rob the stash house (Count 1) or to possess such a weapon in furtherance of a drug trafficking crime (Count 4).  Therefore, even if we were to accept Appellants' invitation to assume the jury concluded that Cius and Gustama were not predisposed to rob the stash house, that does not mean that they were not predisposed to possess firearms in furtherance of a drug trafficking crime.

The need for firearms was discussed at every meeting leading up to the day Cius and Gustama were arrested.   At the time of the arrests, agents recovered three firearms under the rental car.  Agent Conklin testified that he saw Isnadin remove a handgun from his waistband and slide it under the car.  One of the other guns, a Glock pistol, was found near where Gustama was lying on the ground.  To be sure, during its closing argument, the prosecution summarized this evidence as being "tools of the trade" necessary to rob the stash house and steal the cocaine.  However, the Government also referred to the weapons as "tools" needed to engage in a drug conspiracy.

As we have previously noted, "numerous cases have recognized that guns are a tool of the drug trade.  There is a frequent and overpowering connection between the use of firearms and narcotics traffic."  United States v. Pham, 463 F.3d 1239, 1246 (11th Cir. 2006) (quoting United States v. Cruz, 805 F.2d 1464, 1474 (11th Cir. 1986)).  For this reason, it is reasonably foreseeable that a co-

conspirator would possess a firearm in furtherance of a conspiracy involving possession of a large quantity of illegal drugs. United States v. Fields, 408 F.3d 1356, 1359 (11th Cir. 2005); United States v. Freyre-Lazaro, 3 F.3d 1496, 1506 (11th Cir. 1993). While these legal points are often discussed in connection with sentencing, both legally and logically they are equally applicable when considering whether there was a factual basis for a jury's verdict related to a conspiracy to possess weapons in furtherance of a drug trafficking offense. And in this context, this case law supports the Government's argument that Cius and Gustama were predisposed to participate in such a conspiracy.

### c.    There is Sufficient Evidence to Support Gustama's Convictions on Counts 2 and 4

Gustama argues that the district court erred in denying his motions for judgment of acquittal because the evidence was insufficient for a jury to conclude that he conspired to possess more than 500 kilograms of cocaine with the intent to distribute, in violation of 21 U.S.C. § 846 (Count 2), or that he conspired to use and carry a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) and (o) (Count 4). We consider each count separately.

To sustain a conviction under 21 U.S.C. § 846, as charged in Count 2, the Government must offer sufficient evidence to prove beyond a reasonable doubt that: (1) an illegal agreement existed to possess with intent to distribute a controlled substance; (2) Gustama knew of the agreement; and (3) Gustama

49

knowingly and voluntarily joined the agreement. See United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002). Although the Government was not required to prove that Gustama knew every detail or participated in every stage of the conspiracy, it must have established that he "knew the essential nature of the conspiracy." Id. (internal quotations and citations omitted). "[M]ere presence [at the scene of key events] is inadequate to establish guilt, . . . [but] it is material, highly probative, and not to be discounted." United States v. Gamboa, 166 F.3d 1327, 1332 (11th Cir. 1999) (internal quotations omitted). The Government is not required to prove an overt act in furtherance of a 21 U.S.C. § 846 conspiracy. United States v. Baker, 432 F.3d 1189, 1201 n. 3 (11th Cir. 2005).

Gustama contends that the Government failed to prove the second element —that he had actual knowledge of a conspiratorial plan—because he "did not appear on the [G]overnment's radar until the agent made contact with Cius" and the "conspiracy" was simply a manufactured fallacy that he was incapable of joining. We disagree and find that the Government presented sufficient evidence from which a reasonable trier of fact could find that Gustama knew the goal of the conspiracy.

Gustama accompanied Cius to all four meetings with Agent Connors. His own words and actions demonstrate that he helped with the plan to acquire the narcotics. Gustama asked Agent Connors questions about the location of the house

50

and who would be inside.  Gustama asked Agent Connors if they could get the cocaine without the guards knowing.  After explaining Cius and Gustama would have to rob them, Agent Connors asked Gustama if he could "handle" it, to which Gustama replied, "Yeah."

During the second meeting on December 30, 2011, Gustama asked more questions about the location of the stash house.  He confirmed that only two people would be inside and stated that he preferred a "one-level house."  Gustama also asked if the cocaine would be "wrapped up and ready."  He told Agent Connors that he and Cius would need to bring a bag with them.  Gustama asked Agent Connors what was the least amount of cocaine he had seen inside the house.  Agent Connors said, "Fifteen."  When Agent Connors reminded Gustama that he wanted his five kilograms, Gustama responded, "Yeah, you'll get that."  Gustama told Agent Connors he wanted to know how many people were in the house before he entered, and they agreed Agent Connors would send a coded text message with that information.  Gustama also confirmed with Agent Connors that they would need at least three, maybe four, people.  Gustama also told Agent Connors again that "we know how to handle that."

At the third meeting on January 8, 2012, Cius, Gustama, and Agent Connors discussed the use of a rental car as the getaway car. On January 11, 2012, Gustama drove himself, Cius, Isnadin, and McKnight to a gas station, and they followed

51

Agent Connors to the warehouse to pick up the rental car.  Gustama was dressed in dark clothes and gloves.  When Agent Connors reviewed the plan, Gustama reminded him to send a text message about how many people were inside. Gustama also told Agent Connors that they would leave his share of the cocaine in the trunk of the rental car.

Based upon this evidence, we conclude it was reasonable for the jury to infer Gustama had knowledge of the conspiratorial plan to possess cocaine from the stash house.  On multiple occasions he asked about where the cocaine would be located, how it would be packaged, and who would be guarding it.  On multiple occasions he requested that Agent Connors send a text message about how many people were inside the stash house.  On multiple occasions he confirmed that he and Cius could handle the job.  That Gustama was unknown to the Government until Agent Connors made contact with Cius is simply of no moment.  He was present for four different meetings with Agent Connors, who explained he needed individuals willing to acquire the drugs.  Gustama drove himself and the others to the staging area on the day in question.  He wore dark clothing and gloves.

There was more than ample evidence which permitted the jury to conclude that Gustama knew the agreement was to acquire cocaine.  See United States v. Gianni, 678 F.2d 956, 959 (11th Cir. 1982) (commenting that specifically regarding the agreement element, "[t]here is rarely any direct evidence of an

agreement to join a criminal conspiracy" and that "a defendant's assent can be inferred from acts furthering the conspiracy's purpose"). Moreover, that Gustama expected to find such a substantial amount of cocaine in the stash house demonstrates that he understood the goal of the conspiracy was to possess the cocaine with the intent to distribute it. See United States v. Carrascal-Olivera, 755 F.2d 1446, 1451 (11th Cir. 1985) (finding that eight kilograms of cocaine was sufficient to support an inference of an intent to distribute). Therefore, we conclude that more than sufficient evidence supports the jury's conclusion that Gustama knowingly joined a conspiracy to possess with the intent to distribute more than 500 grams of cocaine.

To sustain a conviction under 18 U.S.C. § 924(c)(1)(A), as charged in Count 4, the Government must have offered sufficient evidence to prove beyond a reasonable doubt that Gustama: (1) knowingly (2) possessed a firearm (3) during and in relation to a drug trafficking crime or a crime of violence.[32] See United States v. Woodard, 531 F.3d 1352, 1362 (11th Cir. 2008). Possession may be actual or constructive, joint or sole. United States v. Crawford, 906 F.2d 1531, 1535 (11th Cir. 1990). To establish constructive possession, the Government must

---

[32] Here, the jury acquitted Gustama on Count 1, which charged that he conspired to commit a Hobbs Act robbery and convicted him on Count 2, which charged that he conspired to possess cocaine with intent to distribute. Therefore, for purposes of this analysis, the court presumes Gustama challenges his conviction on Count 4 as it relates to the drug trafficking crime charged in Count 2 and not the crime of violence charged in Count 1.

show that a defendant exercised ownership, dominion, or control over the firearm or the vehicle concealing the firearm. *Id.* "The [G]overnment must also establish some nexus between the firearm and the drug trafficking offense to show possession was in furtherance of the crime." United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004) (citing United States v. Timmons, 283 F.3d 1246, 1252-53 (11th Cir. 2002)). "[U]nder § 924(c), a defendant may be liable for a co-conspirator's possession if possession was reasonably foreseeable." Id. at 1234 (citing United States v. Bell, 137 F.3d 1274, 1274-75 (11th Cir. 1998)).

To sustain Gustama's conviction under 18 U.S.C. § 924(o), the Government must prove: (1) a conspiracy existed to commit the substantive offense; (2) Gustama knew of the conspiracy, and (3) Gustama, with knowledge, voluntarily joined it. See United States v. Thompson, 422 F. 3d 1285, 1290 (11th Cir. 2005).

Gustama maintains that there was insufficient evidence that he ever possessed a firearm or induced or conspired with others to do so. But, the evidence below suggests otherwise.

We conclude that the jury could reasonably find that Gustama knew and agreed that he or others would possess firearms during and in furtherance of their conspiracy to possess cocaine with intent to distribute. Agent Connors discussed the need for firearms at each meeting discussing the plan. Gustama overheard Cius tell Agent Connors that the men had enough "fire" to handle the job. Agent

54

Connors confirmed on several occasions that the men guarding the cocaine would be armed.  Because Gustama conspired to possess the cocaine with awareness that firearms would be needed to acquire it, possession of firearms by his co-conspirators was reasonably foreseeable.  A firearm was found lying near Gustama when he was arrested.  Gustama's knowledge that firearms would be needed to acquire the cocaine and his proximity to a firearm when arrested provides sufficient evidence for a jury to conclude that Gustama conspired to use a firearm in connection with a drug trafficking offense.  See Gunn, 369 F.3d at 1234 (because the defendants conspired to commit an armed robbery of cocaine, possession of firearms by their co-conspirator was reasonably foreseeable).  Moreover, the conspiracy to possess the cocaine satisfies the nexus requirement between the firearms and the drug trafficking offense.  See id.

### d.    Gustama Was Not Entrapped as a Matter of Law

Gustama also maintains that the district court erred in denying his motions for judgment of acquittal because he was entrapped a matter of law.  According to Gustama, the jury's question during deliberations "clearly" meant the jurors "had unanimously found entrapment" and that their not guilty verdict as to four of the six counts is proof of that finding.  Gustama is mistaken.  As outlined in detail above, see supra Part III.B.2, Gustama's own words and actions during the undercover operation demonstrate he was predisposed to possess the cocaine and

to carry or use a firearm in relation to the drug trafficking offense. Thus, we cannot say he was entrapped as a matter of law as it relates to those convictions.

## C.    Isnadin's Derivative Entrapment Argument Fails

Isnadin's only argument on appeal is that the evidence was insufficient to support the jury verdicts because he should have been acquitted on all counts based upon an entrapment defense.  Our well-settled precedent compels us to conclude that his argument is without merit.  The law of this circuit is that "[a] defendant cannot avail himself of an entrapment defense unless the initiator of <u>his</u> criminal activity is acting as an agent of the [G]overnment." <u>United States v. Mers</u>, 701 F.2d 1321, 1340 (11th Cir. 1983), <u>cert. denied</u>, 464 U.S. 991 (1983).  Our <u>Mers</u> decision is in line with the majority of circuits that do not recognize derivative or vicarious entrapment.  <u>See, e.g., United States v. Martinez</u>, 979 F.2d 1424, 1432 (10th Cir. 1992), <u>cert. denied</u>, 507 U.S. 1022 (1993) (this majority view supports the purpose behind the entrapment defense, which is "to prohibit the [G]overnment from directly involving an otherwise disinterested and disinclined person [in the commission of] a criminal offense.  When the Government has no contact with the accused, that purpose has no relevance; therefore, without direct Government communication with the defendant, there is no basis for the entrapment defense").

There is no question that Isnadin had no contact with any Government agents until the night of January 11, 2012, when he arrived at the warehouse with

Cius, Gustama, and McKnight.   Indeed, Isnadin admits the Government had no

knowledge of his involvement until the date of the arrests.  He was not present for

any of the planning meetings with Agent Connors.  In addition, he had no

telephone, e-mail, or text message contact with any Government agent.  Therefore,

Isnadin is left with the singular argument that he was a victim of derivative

entrapment and urges this court to recognize the merits of such a defense.  We will

not—and cannot—do so.  We are bound by prior precedent.  See United States v.

Archer, 531 F.3d 1347, 1352 (11th Cir. 2008) (under the prior panel precedent

rule, "a prior panel's holding is binding on all subsequent panels unless and until it

is overruled or undermined to the point of abrogation by the Supreme Court or by

this court sitting en banc").

## IV.  CONCLUSION

Contrary to the Appellants' assertions, the district court's supplemental

instruction was a correct statement of the law regarding entrapment, which has two

separate and distinct elements.  The trial court did not abuse its discretion by

instructing the jury to consider entrapment separately as to each count.  Moreover,

the district court did not err in failing to grant Gustama's motion for judgment of

acquittal as sufficient evidence supports his convictions and neither he nor his co-

defendants were entrapped as a matter of law.  Finally, Isnadin is not entitled to

relief as this Circuit does not recognize derivative entrapment.  Accordingly, we

**AFFIRM** the Appellants' convictions.